**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **CAROLYN SMITH, THE VILLAGE AT HUNTERS CROSSING, L.L.C. and LIRTEX PROPERTIES, LLC,** | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § § | |
| **THE CITY OF BASTROP, TEXAS, CONNIE SCHROEDER, WILLIE LEWIS "BILL" PETERSON, DRUSILLA ROGERS, LYLE NELSON, BILL ENNIS, and DOCK JACKSON, each in his or her official capacity as a member of the City Council of the City of Bastrop, Texas, and LYNDA HUMBLE, DRUSILLA ROGERS, RICK WOMBLE, MICHELLE DODSON, LYLE NELSON AND TABITHA PUCEK, each in his or her official capacity as a Director of Hunters Crossing Local Government Corporation, and TF HUNTERS CROSSING, L.P. as successor-in-interest to FORESTAR (USA) REAL ESTATE GROUP, INC.,** | § § § § § § § § § § § § § § § § § § | **CIVIL ACTION NO. 1:19-cv-01054** |
| **Defendants.** | § § § | |

**NOTICE TO THE COURT**

TO THE HONORABLE JUDGE ROBERT PITMAN:

Pursuant to the Court's Pretrial Order [Dkt. 101] and Local Rule CV-16(e), Plaintiffs Carolyn Smith, The Village at Hunters Crossing, LLC, and Lirtex Properties, LLC, timely submit the following pretrial documents (as applicable), which are attached to this document as:

- **Exhibit A**:     Stipulated Facts. *See* Local Rule CV-16(e)(3).

2027556.v3

- **<u>Exhibit B</u>**:     Plaintiffs' Exhibit List. *See* Local Rule CV-16(e)(4).

- **<u>Exhibit C</u>**:     Plaintiffs' Witness List. *See* Local Rule CV-16(e)(5).

- **<u>Exhibit D</u>**:     Plaintiffs' Proposed Findings of Fact and Conclusions of Law. *See* Local Rule CV-16(e)(8).

- **<u>Exhibit E</u>**:     A Statement of an Estimate of the Probable Length of Trial. *See* Local Rule CV-16(e)(10).

Respectfully submitted,

By:  */s/ Richard D. Milvenan*
Richard D. Milvenan
Texas Bar No. 14171800
Ian M. Davis
Texas Bar No. 24120793

**McGinnis Lochridge LLP**
600 Congress Avenue, Suite 2100
Austin, Texas 78701
Telephone:  (512) 495-6000
Facsimile:  (512) 505-6331
rmilvenan@mcginnislaw.com
idavis@mcginnislaw.com

**COUNSEL FOR PLAINTIFFS**

2027556.v3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2021, the above and foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record as follows:

George E. Hyde
Bradford E. Bullock
Russell Rodriguez Hyde Bullock, LLP
1633 Williams Drive, Bldg. 2, Suite 200
Georgetown, Texas 78628
ghyde@txlocalgovlaw.com
bbullock@txlocalgovlaw.com
(866) 929-1641 – fax

**Counsel for Defendant City of Bastrop and Individual Defendants**

Michael J. Whellan
Jeffrey J. Hobbs
Armbrust & Brown, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas  78701
(512) 435-2300 – telephone
(512) 435-2360 – facsimile
mwhellan@abaustin.com
jhobbs@abaustin.com

**Counsel for Defendant
TF Hunters Crossing, L.P.**

Carl 'Bo' Dawson
Ryan & Dawson
770 South Post Oak Lane, Suite 600
Houston, Texas 77056
cdawson@rdlaw.com
(713) 960-8497 – fax

**Counsel for Defendant Forestar (USA) Real Estate Group, Inc.**

*/s/ Richard D. Milvenan*
Richard D. Milvenan

2027556.v3

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **CAROLYN SMITH, THE VILLAGE AT HUNTERS CROSSING, L.L.C. and LIRTEX PROPERTIES, LLC,** | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § § | |
| **THE CITY OF BASTROP, TEXAS, CONNIE SCHROEDER, WILLIE LEWIS "BILL" PETERSON, DRUSILLA ROGERS, LYLE NELSON, BILL ENNIS, and DOCK JACKSON, each in his or her official capacity as a member of the City Council of the City of Bastrop, Texas, and LYNDA HUMBLE, DRUSILLA ROGERS, RICK WOMBLE, MICHELLE DODSON, LYLE NELSON AND TABITHA PUCEK, each in his or her official capacity as a Director of Hunters Crossing Local Government Corporation, and TF HUNTERS CROSSING, L.P. as successor-in-interest to FORESTAR (USA) REAL ESTATE GROUP, INC.,** | § § § § § § § § § § § § § § § § § § § § | **CIVIL ACTION NO. 1:19-cv-01054** |
| **Defendants.** | § § § | |

## STIPULATED FACTS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE ROBERT L. PITMAN:

Pursuant to Local Rule CV-16(e)(3), Plaintiffs Carolyn Smith, The Village at Hunters

Crossing, L.L.C., and LIRTEX Properties, LLC, ("Plaintiffs") and Defendants City of Bastrop,

Texas, Connie Schroeder, Willie Lewis "Bill" Peterson, Drusilla Rogers, Lyle Nelson, Bill Ennis,

Dock Jackson, Paul Hofmann, Rick Womble, Michelle Dodson and Tabitha Pucek ("City

Defendants"), and TF Hunters Crossing, LP (combined "Defendants") file the following stipulated facts for trial in the above-referenced and numbered case:

1.   On September 11, 2001, the City of Bastrop (the "City") approved Resolution No. R-2001-19.

2.   On November 11, 2003, the City approved Resolution No. R-2003-34.

3.   On November 11, 2003, the City approved Resolution No. R-2003-36.

4.   On November 13, 2003, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on November 25, 2003 regarding Ordinance No. 2003-35.

5.   On November 25, 2003, the City Council approved the first reading of Ordinance No. 2003-35.

6.   On December 9, 2003, the City adopted Ordinance No. 2003-35 (the "2003 Ordinance").

7.   On February 2, 2004, the 2003 Ordinance was recorded as document no. 200401641 in the real property records of Bastrop County.

8.   At the time the 2003 Ordinance was enacted, the original PID developer, Sabine Investment Company ("Sabine"), owned all of the properties in the PID except for three properties: (i) "HXC-1 (Home Depot Lot 1) (property ID no. 90301); (ii) HXC-1 (Chilis Lot 1) (property ID no. 92325); and (iii) HXC-1 (Balance of Retail Lot 2) (property ID no. 95379).

9.   On February 24, 2004, the original PID developer, Sabine, entered into a Development and Reimbursement Agreement with the City.

10.  On November 11, 2004, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on November 23, 2004, to consider an amendment to the 2003 Ordinance.

11.  On December 14, 2004, the City adopted Ordinance No. 2004-42 (the "2004 Ordinance").

12.  On December 27, 2004, the 2004 Ordinance was recorded as document no. 200420005 in the real property records of Bastrop County.

13.  Plaintiff Carolyn Smith is an individual residing in Bastrop, Texas, acting as Trustee of the Smith Family Revocable Trust.

14.  Carolyn Smith's residence is identified as property ID no. R95408 in Ordinance No. 2019-40 (the "2019 Ordinance").

15.  Plaintiff LIRTEX Properties, LLC ("LIRTEX") is a Texas limited liability company doing business in Bastrop, Texas.

16.  LIRTEX owns the real property identified as HXC-2 in the 2003 Ordinance, and property ID nos. R114958 and R30102 in the 2019 Ordinance.

17.     Plaintiff The Village at Hunters Crossing, LLC ("VHC") is a Texas limited liability company doing business in Bastrop, Texas.

18.     VHC owns portions of the real property identified as HXC-5, HXM-1, and HXP-4 in the 2003 Ordinance, and property ID no. R104899 in the 2019 Ordinance.

19.     Defendant The City of Bastrop, Texas is a home-rule municipality located in Bastrop County, Texas.

20.     Defendant The Hunters Crossing Local Development Corporation ("HCLGC") was incorporated on March 23, 2004.

21.     Defendant Connie Schroeder is sued in her official capacity as Mayor and Council Member of the City of Bastrop.

22.     Defendant Willie Lewis "Bill" Peterson is sued in his official capacity as a Council Member of the City of Bastrop.

23.     Defendant Drusilla Rogers is sued in her official capacity as a Council Member of the City of Bastrop and in her official capacity as Director of Hunters Crossing Local Government Corporation

24.     Defendant Lyle Nelson is sued in his official capacity as a Council Member of the City of Bastrop and in his official capacity as Director of Hunters Crossing Local Government Corporation

25.     Bill Ennis is sued in his official capacity as a Council Member of the City of Bastrop.

26.     Dock Jackson is sued in his official capacity as a Council Member of the City of Bastrop.

27.     Paul Hofmann is sued in his official capacity as Director of Hunters Crossing Local Government Corporation.

28.     Rick Womble is sued in his official capacity as Director of Hunters Crossing Local Government Corporation.

29.     Michelle Dodson is sued in her official capacity as Director of Hunters Crossing Local Government Corporation.

30.     Tabitha Pucek is sued in her official capacity as Director of Hunters Crossing Local Government Corporation.

31.     At the inception of the PID, the original PID developer was Sabine Investment Company ("Sabine").

32.    Sometime in 2005, Sabine changed its name to Forestar (USA) Real Estate Group, Inc. ("Forestar").

33.    At the time the 2003 Ordinance was enacted, the original developer owned a majority of the land comprising the PID.

34.    Defendant TF Hunters Crossing is a Delaware limited partnership with its principal place of business in Miami, Florida.

35.    In February 2018, TF Hunters Crossing executed a contract with the original PID developer, Sabine/Forestar.

36.    Pursuant to the TFHC-Sabine/Forestar contract, Sabine/Forestar assigned to TFHC the right to receive all PID developer reimbursements under the 2004 Development and Reimbursement Agreement with the City.

37.    On February 7, 2018, pursuant to the TFHC-Sabine/Forestar contract, Sabine/Forestar also conveyed to TFHC by special warranty deed roughly 38 acres of land in the PID.

38.    In 2005, the original PID developer, Sabine/Forestar, broke ground on PID improvement projects.

39.    Neither the City nor the HCLGC has incurred any project costs for capital improvements associated with the PID.

40.    The City has never issued bonds in connection with the PID.

41.    The City never issued a time warrant or temporary note to the PID developer to fund the construction of capital improvements.

42.    The original developer never borrowed any money from the City to pay for capital improvement project costs associated with the PID.

43.    TFHC has never borrowed any money from the City to pay for capital improvement project costs associated with the PID.

44.    The City did not, at any time from 2005 through August 2019, update or amend the 2003 Ordinance, or adopt a new ordinance governing the PID, to include capital improvement expenditures incurred or spent by the PID developer from 2005 through 2018

45.    In 2011, the HCLGC commissioned an independent accountant, Singleton, Clark & Company, PC ("Singleton") to perform an Analysis of Developer Costs from July 1, 2007 to June 30, 2010 (the "Singleton Report").

46.    When the Singleton Report was issued on July 12, 2011, the original developer had completed the majority of all capital improvement projects in the PID.

47.    On September 28, 2017, the City Council reviewed the 2003 service and assessment plan.

48.    On September 28, 2017, the City of Bastrop adopted Ordinance No. 2017-26.

49.    On September 25, 2018, the City Council reviewed the 2003 service and assessment plan.

50.    On September 25, 2018, the City of Bastrop adopted Ordinance No. 2018-24.

51.    On September 24, 2019, the City of Bastrop adopted Ordinance No. 2019-40.

52.    As of September 24, 2019, the Bastrop County Tax Assessor collected an aggregate of $2,205,097.71 in capital assessment payments from all PID property owners, the entirety of which was reimbursed by the City to the Developer pursuant to the 2004 Development and Reimbursement Agreement.

53.    From the inception of the PID until September 24, 2019, the Bastrop County Tax Assessor collected PID assessments by property ID.

54.    The annual assessment installments were identified as one aggregate sum that included both the annual capital assessment installment and the annual operations and maintenance ("O&M") assessment installment.

55.    On August 19, 2019, the City hosted a town hall meeting to review the proposed 2019 amended and restated service and assessment plan ("2019 SAP").

56.    At the August 19, 2019 town hall meeting, the City provided PID property owners with a four-page pamphlet (the "Town Hall Pamphlet") explaining the impetus behind the 2019 Ordinance as well as its contents.

57.    On August 31, 2019, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on September 10, 2019 to consider the 2019 annual review of the service and assessment plan.

58.    On September 10, 2019, the City approved the first reading of Ordinance No. 2019-40.

59.    On September 12, 2019, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on September 24, 2019 to consider the annual review of the 2019 annual review of the service and assessment plan.

60.    On September 24, 2019, the City of Bastrop adopted Ordinance No. 2019-40.

61.    On September 24, 2019, the City of Bastrop adopted Resolution No. R-2019-86.

62.    The capital improvement costs associated with PID improvement projects have all been incurred by TFHC and its predecessor in interest, Sabine/Forestar.

Respectfully submitted,

| | |
|---|---|
| By:  */s/ Richard D. Milvenan*<br><br>Richard D. Milvenan<br>Texas Bar No. 14171800<br>Ian M. Davis<br>Texas Bar No. 24120793<br><br>**McGinnis Lochridge LLP**<br>600 Congress Avenue, Suite 2100<br>Austin, Texas 78701<br>Telephone:  (512) 495-6000<br>Facsimile: (512) 505-6331<br>rmilvenan@mcginnislaw.com<br>idavis@mcginnislaw.com<br>**Counsel for Plaintiffs** | By:  */s/ George E. Hyde*<br><br>George E. Hyde<br>Texas Bar No. 45006157<br>Bradford E. Bullock<br>Texas Bar No. 00793423<br><br>**Russell Rodriguez Hyde Bullock, LLP**<br>1633 Williams Drive, Bldg. 2, Suite 200<br>Georgetown, Texas 78628<br>ghyde@txlocalgovlaw.com<br>bbullock@txlocalgovlaw.com<br>(866) 929-1641 – fax<br><br>**Counsel for Defendant City of Bastrop and Individual Defendants** |
| By:  */s/ Michael J. Whellan*<br><br>Michael J. Whellan<br>Texas Bar. No. 21265550<br>Jeffrey J. Hobbs<br>Texas Bar No. 24012837<br><br>**Armbrust & Brown, PLLC**<br>100 Congress Avenue, Suite 1300<br>Austin, Texas  78701<br>(512) 435-2300 – telephone<br>(512) 435-2360 – facsimile<br>mwhellan@abaustin.com<br>jhobbs@abaustin.com<br><br>**Counsel for Defendant TF Hunters Crossing, L.P.** | |

# EXHIBIT B

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-001 | X | | City of Bastrop Resolution No. R-2001-19 | 9/11/2001 | PLAINTIFFS_000159–164 | | |
| P-002 | X | | City of Bastrop Resolution No. R-2003-34 | 11/11/2003 | PLAINTIFFS_000242–245 | | |
| P-003 | X | | City of Bastrop Ordinance No. 2003-35 (Including Attached Exhibits) | 12/9/2003 | PLAINTIFFS_000174–000220 | | |
| P-004 | X | | City of Bastrop Ordinance No. 2004-42 | 12/14/2004 | PLAINTIFFS_000233–241 | | |
| P-005 | X | | 2004 Development and Reimbursement Agreement | 2/24/2004 | PLAINTIFFS_000221–232 | | |
| P-006 | X | | City of Bastrop Ordinance No. 2017-26 | 9/28/2017 | COB_00000299–302 | | |
| P-007 | X | | City of Bastrop Ordinance No. 2018-24 | 9/25/2018 | COB_00000303–306 | | |
| P-008 | X | | City of Bastrop Resolution No. R-2019-86 | 9/24/2019 | PLAINTIFFS_000299–355 | | |
| P-009 | X | | City of Bastrop Ordinance No. 2019-40 (Including Attached Exhibits) | 9/24/2019 | COB_00003339–3407 | | |

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-010 | X | | Hunters Crossing Local Government Corporation Meeting Minutes and Notice from September 23, 2013 Meeting | 9/23/2013 | COB_00011088–93 | | |
| P-011 | X | | Hunters Crossing Local Government Corporation Meeting Minutes and Notice from September 10, 2014 Meeting | 9/10/2014 | COB_00004036–38 | | |
| P-012 | X | | Hunters Crossing Local Government Corporation Meeting Minutes and Notice from September 24, 2014 Meeting | 9/24/2014 | COB_00004039–42 | | |
| P-013 | X | | Hunters Crossing Local Government Corporation Meeting Minutes and Notice from August 17, 2015 Meeting | 8/17/2015 | COB_00004046–49 | | |
| P-014 | X | | Hunters Crossing Local Government Corporation Meeting Minutes and Notice from September 23, 2015 Meeting | 9/23/2015 | COB_00004050–53 | | |
| P-015 | X | | Hunters Crossing Local Government Corporation Meeting Minutes and Notice from September 28, 2016 Meeting | 9/28/2016 | COB_00004065–71 | | |
| P-016 | X | | Hunters Crossing Local Government Corporation Articles of Incorporation | 3/23/2004 | Defendants' MSJ Exhibit 10 | | |
| P-017 | X | | Hunters Crossing Local Government Corporation First Amended Bylaws | 7/5/2011 | COB_00003801–815 | | |
| P-018 | X | | Singleton Clark & Company Analysis of Developer Costs | 7/12/2011 | COB_00008106–8119 | | |

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-019 | X | | August 19, 2019 Town Hall Meeting Pamphlet | 9/19/2019 | PLAINTIFFS_000248–251 | | |
| P-020 | X | | City of Bastrop City Council Meeting Minutes from September 10, 2019 | 9/10/2019 | TFHC_001925–32 | | |
| P-021 | X | | LIRTEX Special Warranty Deed | 12/23/2015 | COB_00000290–296 | | |
| P-022 | X | | The Village at Hunters Crossing Special Warranty Deed | 11/16/2017 | TFHC_088859–60 | | |
| P-023 | X | | Howard Schain Special Warranty Deed | 5/15/2015 | PLAINTIFFS_000032–40 | | |
| P-024 | X | | Smith Family Revocable Trust Deed – 2014 | 12/2/2014 | PLAINTIFFS_000461–63 | | |
| P-025 | X | | Smith Revocable Trust Deed – 2004 | 7/30/2004 | PLAINTIFFS_000465 – 66 | | |
| P-026 | X | | July 26, 2017 Hunters Crossing Local Government Corporation Meeting Agenda | 7/26/2017 | COB_00022637–54 | | |
| P-027 | X | | Glass & Company Memo | 7/20/2019 | TFHC_000603–607 | | |
| P-028 | X | | Emails between George Hyde and Misty Ventura, Dated March 26, 2018 through April 20, 2018 | 3/26/2018 - 4/20/2018 | COB_00012266–12279 | | |

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-029 | X | | Expert Report of Plaintiffs' Expert R. Christopher Anderson | 8/14/2020 | Plaintiffs' MSJ Exhibit 10 | | |
| P-030 | X | | Rebuttal Expert Report of Plaintiffs' Expert R. Christopher Anderson | 10/7/2020 | Plaintiffs' Response to Defendants' MSJ Attachment B,  Exhibit 1 | | |
| P-031 | X | | Declaration of Plaintiffs' Expert R. Christopher Anderson | 11/6/2020 | Plaintiffs' Response to Defendants' MSJ Attachemnt B | | |
| P-032 | X | | Email from George Hyde to Misty Ventura, Dated July 12, 2018 | 7/12/2018 | COB_00012819–12820 | | |
| P-033 | X | | Letter from George Hyde to Robert Reetz, Dated September 19, 2019 | 9/19/2019 | PLAINTIFFS_000002–03 | | |
| P-034 | X | | PID Payments Through Tax Year 2018, Dated June 12, 2019 | 6/12/2019 | COB_00015584 | | |
| P-035 | X | | Emails Between Tracy Waldron and Joyce Schanhals, Dated March 6, 2019 and March 7, 2019 | 3/6/2019 - 3/7/2019 | COB_00015353–54 | | |
| P-036 | X | | Emails Between Tracy Waldron and Jean Riemenschneider, Dated June 23, 2017 through June 26, 2017 | 6/23/2017 - 6/26/2017 | COB_00015277–79 | | |
| P-037 | X | | Letter and Invoice Sent from Tracy Waldron to MacDonald & Associates, Inc., Dated June 9, 2017 | 6/9/2017 | TFHC_028597–98 | | |
| P-038 | X | | Emails Between Misty Ventura and MacDonald & Associates, Inc., Dated March 27, 2018 through March 28, 2018 | 3/27/2018 - 3/28/2018 | TFHC_028685–87 | | |

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-039 | X | | 2013 Question and Answer by City Council Member Ken Kesselus | | COB_00000021–30 | | |
| P-040 | X | | Hunters Crossing Public Improvement District Improvement Completion Dates | 10/23/2017 | COB_00012234 | | |
| P-041 | X | | Agreement of Purchase and Sale between Forestar and TFHC | 2/1/2018 | TFHC_017085–017363 | | |
| P-042 | X | | TFHC Special Warranty Deed | 2/8/2018 | TFHC_000007–54 | | |
| P-043 | X | | TFHC Assignment of Public Improvements District Development and Reimbursement Agreement | 2/8/2018 | TFHC_000001–06 | | |
| P-044 | X | | Emails between Misty Ventura and George Hyde, Dated March 26, 2018 through May 15, 2018 | 3/26/2018 - 5/15/2018 | TFHC_017770–83 | | |
| P-045 | X | | Emails between Misty Ventura and Robert Reetz, Dated February 23, 2018 through May 16, 2018 | 2/23/2018 - 5/16/2018 | TFHC_028702–709 | | |
| P-046 | X | | Emails between Misty Ventura and George Hyde, Dated September 9, 2018 through September 10, 2018 | 9/9/2018 - 9/10/2018 | TFHC_018596–98 | | |
| P-047 | X | | Emails Between Misty Ventura and George Hyde, Dated September 9, 2018 through September 10, 2018 | 9/9/2018 - 9/10/2018 | COB_00016110–112 | | |
| P-048 | X | | Email from George Hyde to Misty Ventura, Dated February 1, 2019 | 2/1/2019 | TFHC_019094–95 | | |

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-049 | X | | Emails between George Hyde and Misty Ventura, Dated February 5, 2019 | 2/5/2019 | TFHC_019210–214 | | |
| P-050 | X | | Emails between Misty Ventura, George Hyde, Tracy Waldron, and Roxanne Sheehan, Dated September 4, 2019 through September 6, 2019 | 9/4/2019 - 9/6/2019 | TFHC_023806–810 | | |
| P-051 | X | | Letter from Robert Reetz to Tracy Waldron, Dated September 18, 2019 | 9/18/2019 | COB_00015605–613 | | |
| P-052 | X | | Letter from Robert Reetz to Lynda Humble and Connie Schroeder, Dated October 23, 2019 | 10/23/2019 | TFHC_027902–06 | | |
| P-053 | X | | Email from George Hyde to Robert Reetz, Dated October 25, 2019 | 10/25/2019 | Plaintiffs' Response to Defendants' MSJ Exhibit 38 | | |
| P-054 | X | | Emails between George Hyde and Raymond White, Dated October 30, 2019 to October 31, 2019 | 10/30/2019 - 10/31/2019 | Plaintiffs' Response to Defendants' MSJ Exhibit 39 | | |
| P-055 | X | | City of Bastrop Resolution No. R-2003-36 | 11/11/2003 | PLAINTIFFS_000165–173 | | |
| P-056 | X | | 2019 Amended and Restated Development and Reimbursement Agreement | 9/25/2019 | PLAINTIFFS_000302–355 | | |
| P-057 | X | | City of Bastrop Resolution No. R-2003-34 | 10/25/2003 | COB_00000212–215 | | |
| P-058 | X | | Bastrop County Tax Office 2019 Receipt for VHC | 3/25/2020 | COB_00003503 | | |

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-059 | X | | Hunters Crossing Local Government Corporation Second Amended Bylaws | 5/8/2012 | COB_00008352–8365 | | |
| P-060 | X | | Letter from George Hyde to Misty Ventura, Dated August 6, 2018 | 8/6/2018 | COB00025149–157 | | |
| P-061 | X | | Hunters Crossing PID No. 1 Plan | 7/18/2001 | TFHC_000674–95 | | |
| P-062 | X | | Emails between George Hyde and Misty Ventura, Dated July 23, 2019 through July 31, 2019 | 7/23/2019 - 7/31/2019 | TFHC_008656–58 | | |
| P-063 | X | | Emails between George Hyde, Misty Ventura, Roxanne Sheehan and Larry Dodson, Dated July 31, 2019 | 7/31/2019 | TFHC_ 008642–43 | | |
| P-064 | X | | Declaration of Robert Reetz, Dated October 9, 2020 | 10/9/2020 | Plaintiffs' MSJ Exhibit B | | |
| P-065 | X | | Declaration of Robert Reetz, Dated November 9, 2020 | 11/9/2020 | Plaintiffs' Response to Defendants' MSJ Attachment E | | |
| P-066 | X | | City of Bastrop Defendants' Answers to Plaintiff The Village at Hunters Crossing, LLC's Interrogatories and Requests for Admission | 5/1/2020 | | | |
| P-067 | X | | City of Bastrop Defendants' Answers to Plaintiff Carolyn Smith's Interrogatories and Requests for Admission | 5/1/2020 | | | |
| P-068 | X | | City of Bastrop Defendants' Answers to Plaintiff Lirtex Properties, LLC's Interrogatories and Requests for Admission | 5/1/2020 | | | |

**SMITH ET AL. v. BASTROP ET AL.**
**WESTERN DISTRICT OF TEXAS (AUSTIN DIVISION)**
**CIVIL ACTION NO.:  1:19-cv-01054**

**JUDGE ROBERT L. PITMAN**

# TRIAL EXHIBIT LIST

| EXHIBIT NO. | EXPECT TO OFFER | MAY OFFER | EXHIBIT DESCRIPTION | EXHIBIT DATE | BATES RANGE | PLAINTIFFS' OBJECTIONS | DEFENDANTS' OBJECTIONS |
|---|---|---|---|---|---|---|---|
| P-069 | X | | TF Hunters Crossing, LP's Answers to Plaintiff The Village at Hunters Crossing, LLC's Interrogatories and Requests for Admission | 5/1/2020 | | | |
| P-070 | X | | TF Hunters Crossing, LP's Answers to Plaintiff Carolyn Smith's Interrogatories and Requests for Admission | 5/1/2020 | | | |
| P-071 | X | | TF Hunters Crossing, LP's Answers to Plaintiff Lirtex Properties, LLC's Interrogatories and Requests for Admission | 5/1/2020 | | | |
| P-072 | X | | July 11th Meeting Agreement of the Parties | 7/23/2019 | COB_00016175–78 | | |
| P-073 | X | | Comparison of Assessments Between Original and Amended Ordinances | 2/6/2019 | COB_00013175 | | |
| P-074 | X | | Emails between George Hyde, Misty Ventura, Roxanne Sheehan, and Tracy Waldron, Dated February 6, 2019 | 2/6/2019 | COB_00013169–71 | | |
| P-075 | X | | Emails between George Hyde and Robert Reetz, Dated July 2, 2019 through July 3, 2019 | 7/2/2019 - 7/3/2019 | | | |

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLYN SMITH, THE VILLAGE AT HUNTERS CROSSING, L.L.C. and LIRTEX PROPERTIES, LLC, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| THE CITY OF BASTROP, TEXAS, CONNIE SCHROEDER, WILLIE LEWIS "BILL" PETERSON, DRUSILLA ROGERS, LYLE NELSON, BILL ENNIS, and DOCK JACKSON, each in his or her official capacity as a member of the City Council of the City of Bastrop, Texas, and LYNDA HUMBLE, DRUSILLA ROGERS, RICK WOMBLE, MICHELLE DODSON, LYLE NELSON AND TABITHA PUCEK, each in his or her official capacity as a Director of Hunters Crossing Local Government Corporation, and TF HUNTERS CROSSING, L.P. as successor-in-interest to FORESTAR (USA) REAL ESTATE GROUP, INC., | § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 1:19-cv-01054 |
| Defendants. | § § § | |

## PLAINTIFFS' TRIAL WITNESS LIST

Pursuant to Local Rule 16(e)(5), Plaintiffs Carolyn Smith, LIRTEX Properties, LLC, and The Village at Hunters Crossing, LLC ("Plaintiffs") submit the following trial witness list. Plaintiffs expect to call at trial the witnesses identified below. Plaintiffs may also call individuals listed on Defendants' witness list, as well as individuals necessary for rebuttal.

| Witness Name | Address | Phone Number | Expect to Present or Only if the Need Arises |
|---|---|---|---|
| Carolyn Smith | 116 Outfitter Drive Bastrop, Texas 78602 | (512) 417-0508 | Plaintiffs expect to present this witness |
| Carlos Liriano | 806 Hwy 71 East Bastrop, Texas 78602 | (504) 416-2723 | Plaintiffs expect to present this witness |
| Howard Schain | 370 Atlantic Avenue Brooklyn, New York 11217-1703 | (917) 453-0461 | Plaintiffs expect to present this witness |
| R. Christopher Anderson | 823 Congress Avenue Suite 300 Austin, Texas 78701 | (512) 649-2976 | Plaintiffs expect to present this witness |
| Misty Ventura [Adverse] | 9406 Biscayne Blvd. Dallas, Texas 75218 | (214) 328-1101 | Plaintiffs will only call this witness if the need arises |
| George Hyde [Adverse] | 1633 Williams Drive Building 2, Suite 200 Georgetown, Texas 78628 | (512) 930-1317 | Plaintiffs will only call this witness if the need arises |
| Tracy Waldron [Adverse] | 1311 Chestnut Street Bastrop, Texas 78602 | (512) 332-8820 | Plaintiffs will only call this witness if the need arises |
| Robert Reetz | 600 Congress Ave Suite 2100 Austin, Texas 78701 | (512) 495-6062 | Plaintiffs will only call this witness if the need arises |

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CAROLYN SMITH, THE VILLAGE AT HUNTERS CROSSING, L.L.C. and LIRTEX PROPERTIES, LLC, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| THE CITY OF BASTROP, TEXAS, CONNIE SCHROEDER, WILLIE LEWIS "BILL" PETERSON, DRUSILLA ROGERS, LYLE NELSON, BILL ENNIS, and DOCK JACKSON, each in his or her official capacity as a member of the City Council of the City of Bastrop, Texas, and LYNDA HUMBLE, DRUSILLA ROGERS, RICK WOMBLE, MICHELLE DODSON, LYLE NELSON AND TABITHA PUCEK, each in his or her official capacity as a Director of Hunters Crossing Local Government Corporation, and TF HUNTERS CROSSING, L.P. as successor-in-interest to FORESTAR (USA) REAL ESTATE GROUP, INC., | § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 1:19-cv-01054 |
| Defendants. | § § § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs, three landowners residing within the Hunters Crossing Public Improvement District of Bastrop, Texas, bring suit against the City Defendants, which includes the City of Bastrop, Texas (the "City"), the City Council members for the City of Bastrop,[1] and the Directors of Hunters Crossing Local Government Corporation ("HCLGC"),[2] alleging claims under 42 U.S.C. § 1983. Plaintiffs contend that by enacting Resolution No. R-2019-86 and Ordinance No. 2019-40, the

---

[1] The individual members of the City Council are Connie Schroeder, Willie Lewis "Bill" Peterson, Drusilla Rogers, Lyle Nelson, Bill Ennis, and Dock Jackson.

[2] The individual members of HCLGC are Lynda Humble, Drusilla Rogers, Rick Womble, Michelle Dodson, Lyle Nelson, and Tabitha Pucek.

2028610.v1

City Defendants violated multiple sections of the Texas Public Improvement District and Assessment Act (the "PIDA Act"), which deprived Plaintiffs of their substantive and procedural due process rights under the United States Constitution.

Plaintiffs also bring suit against the Defendant TF Hunters Crossing, LP ("TFHC") for negligent misrepresentation, alleging that TFHC negligently represented or omitted information related to Plaintiffs' PID assessments.

On May 17, 2021, the Court began a bench trial on this case that concluded on May _, 2021. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the following findings of fact and conclusions of law are now made after the conclusion of the bench trial. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

## I.    BACKGROUND

This is a suit to determine the constitutional validity of Defendant City of Bastrop's Ordinance No. 2019-40.

On October 28, 2019, Plaintiffs filed suit against the City, the Individual Defendants,[3] and TFHC, alleging that the City levied illegal assessments against property owners within a public improvement district created by the City. Under 42 U.S.C. § 1983, Plaintiffs allege that the City's action of increasing their property assessments in contravention of the Texas Public Improvement District and Assessment Act ("PIDA Act") deprived them of due process.

Plaintiffs seek (i) a declaration that the 2019 Ordinance is invalid and unenforceable under the United States Constitution, Texas Constitution and state law; (ii) a declaration that the Individual Defendants acted *ultra vires* by seeking to enforce the 2019 Ordinance; (iii) a declaration that Plaintiffs' property assessments arising under the PIDA Act are limited to and may not be increased from an amount calculated by each property owner's portion of the 2003 assessment of $7,475,734, less any payments that Plaintiffs' has made on their individual parcels and less the proportionate amount that the original developer should have paid in assessments on land it held from 2003 onward; (iv) a permanent injunction restraining the Individual Defendants from implementing or enforcing the 2019 Ordinance; (v) a judgment for negligent misrepresentation against TFHC; and (vi) reasonable and necessary attorneys' fees and costs of court.

On July 15, 2020, United States Magistrate Judge Susan Hightower issued a Report and recommendation in which she recommended that Forestar (USA) Real Estate Group, Inc. ("Forestar" or "the original developer") be dismissed from the case. Dkt. 42.

On September 2, 2020, the Court entered an order adopting Judge Hightower's Report and Recommendation dismissing Forestar from the case. Dkt. 54.

---

[3] The Individual Defendants are the City Council members for the City of Bastrop and the Directors of Hunters Crossing Local Government Corporation.

On October 5, 2020, Plaintiffs filed a Motion to Exclude Defendants' Expert Julie Fort, Dkt. 61, and a Motion to Exclude Defendants' Expert Patrick Bourne, Dkt. 62.

On October 9, 2020, Plaintiffs filed a Motion for Partial Summary Judgement. Dkt. 64.

On October 23, 2020, Defendants filed a Motion to Strike Declaration and Testimony of Raymond White. Dkt. 70.

On October 26, 2020, Defendants filed a Joint Response to Plaintiffs' Motion for Partial Summary Judgment and a Cross-Motion for Summary Judgment on Plaintiffs' claims. Dkt. 71.

On November 9, 2020, Plaintiffs filed a Reply in Support of their Motion for Partial Summary Judgment and Response to Defendants' Cross-Motion for Summary Judgment. Dkt. 75.

On November 16, 2020, Defendants filed a Reply to Plaintiffs' Response to Defendants' Cross-Motion for Summary Judgment. Dkt. 77.

On January 15, 2021, United States Magistrate Judge Susan Hightower issued an Order in which she granted in part and denied in part Plaintiffs' Motion to Exclude Defendants' Expert Julie Fort. Dkt. 85. Specifically, Judge Hightower denied Plaintiffs' Motion as to Fort's opinions regarding common practices of PIDs listed at page 6 of the Order, and granted Plaintiffs' Motion and excluded the remainder of Fort's report and proposed testimony. Dkt. 85 at 6, 15. In the same Order, Judge Hightower granted in part and denied in part Plaintiffs' Motion to Exclude Defendants' Expert Patrick Bourne. Dkt. 85. Specifically, Judge Hightower granted Plaintiffs' Motion and excluded Section II of Bourne's report and proposed testimony, and denied the remainder of Plaintiffs' Motion. Dkt. 85 at 15.

On January 26, 2021, United States Magistrate Judge Susan Hightower issued an Order, Report and Recommendation on Plaintiff's Motion for Partial Summary Judgment, Dkt. 64, Defendants' Motion to Strike the Declaration and Testimony of Raymond White, Dkt. 70, and Defendants' Joint Response and Cross-Motion for Summary Judgment, Dkt. 71. Dkt. 86.

In the Order, Judge Hightower granted Defendants' Motion to Strike the Declaration and Testimony of Raymond White. Dkt. 86 at 5.

In the Report and Recommendation, Judge Hightower recommended that the Court deny Plaintiffs' Motion for Partial Summary Judgment and grant in part and deny in part Defendants' Cross-Motion for Summary Judgment. Dkt. 86 at 17. Specifically, Judge Hightower recommended that the Court grant Defendants' Cross-Motion only to the extent that Count 1 of Plaintiffs' live Complaint, Dkt. 55, "requests a declaration that City of Bastrop Ordinance No. 2019-40 is invalid because it violates due process requirements relating to the right to (i) exclude interest from the principal assessment or (ii) payoff assessments," and otherwise denied the Motion. Dkt. 86 at 17.

On February 8, 2021, Plaintiffs filed an Objection to Report and Recommendation of United States Magistrate Judge. Dkt. 89.

On February 8, 2021, Defendants filed an Objection to Report and Recommendation of United States Magistrate Judge. Dkt. 90.

On March 5, 2021, Plaintiffs filed a Response to Defendants' Objection to Report and Recommendation of United States Magistrate Judge. Dkt. 93.

On March 5, 2021, Defendants filed a Response to Plaintiffs' Objection to Report and Recommendation of United States Magistrate Judge. Dkt. 92.

On March 9, 2021, Plaintiffs filed a Reply to Defendants' Response to Plaintiffs' Objection to Report and Recommendation of United States Magistrate Judge. Dkt. 96.

On March 16, 2021, the Court entered an Order adopting Judge Hightower's Report and Recommendation with additional clarification in the Order. Dkt. 99.

## II.    JURISDICTION AND VENUE

This Court has jurisdiction over this suit because this suit arises under the United States Constitution and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3). This suit is brought in relevant part pursuant to 42 U.S.C. § 1983. The claims that do not present a federal question in this lawsuit are intrinsically related to the federal claims and are a part of the same case or controversy, and are therefore appropriate for supplemental jurisdiction under 28 U.S.C. § 1367(a).

This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, and injunctive relief pursuant to Federal Rule of Civil Procedure 65.

Venue in the Western District of Texas is proper under 27 U.S.C. § 1391(b)(1) because Bastrop County, Texas is within the district and is where many or all of the natural person defendants, as well as the City, reside. Venue is also proper in this district under 27 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in the City of Bastrop, which is within the Western District.

## III.    FINDINGS OF FACT

### THE HUNTERS CROSSING PUBLIC IMPROVEMENT DISTRICT

1.    On September 11, 2001, the City of Bastrop (the "City") approved Resolution No. R-2001-19, which authorized the establishment of the Hunters Crossing Public Improvement District (the "PID") pursuant to TEX. LOC. GOV'T CODE §§ 372.001–372.030 (the "PIDA Act"). Exhibit P-001.

2.    The PID was established to finance public improvements on roughly 283 acres of land within the City's territorial jurisdiction. Exhibit P-001.

3.    Pursuant to Resolution No. R-2001-19, the City estimated that the total cost of improvements would equal $14.5 million. Exhibit P-001.

4.    On November 11, 2003, the City approved Resolution No. R-2003-34, which amended Resolution No. R-2001-19 and revised the estimated costs of capital improvements from $14.5 million to $7.476 million. Exhibit P-002.

5.      Resolution No. R-2003-34 called for the preparation of a service and assessment plan. Exhibit P-002.

6.      On November 11, 2003, the City approved Resolution No. R-2003-36, which directed the filing of the proposed assessment roll for the PID with the City Secretary of the City and directed publication of a public hearing to consider the proposed assessments. Exhibit P-055.

7.      On November 13, 2003, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on November 25, 2003 regarding Ordinance No. 2003-35. Stipulated Fact 4.

8.      On November 25, 2003, the City Council approved the first reading of Ordinance No. 2003-35. Stipulated Fact 5.

**THE 2003 ORDINANCE**

9.      On December 9, 2003, the City passed Ordinance No. 2003-35 (the "2003 Ordinance"). Exhibit P-003.

10.     The 2003 Ordinance approved the 2003 service and assessment plan ("SAP") and levied the capital assessments against "the respective parcels of property within the PID and against the owners thereof[.]" Exhibit P-003.

11.     The 2003 Ordinance identified various parcels then-existing in the PID and classified them as either "commercial," "multifamily," "single-family," "park & trails," or "right of way" properties. Exhibit P-003.

12.     Under the 2003 Ordinance, the "park & trails" and "right of way" properties were exempted from paying capital assessments. Exhibit P-003.

13.     The 2003 Ordinance apportioned the capital assessments on a parcel-by-parcel basis using per square foot formulas for commercial and multifamily parcels, and a per-lot fixed sum for single-family properties. Exhibit P-003.

14.     The 2003 Ordinance's approved capital assessments included unique amounts for both principal and interest. Exhibit P-003.

15.     The principal component of the 2003 Ordinance's capital assessments was the total estimated costs of the planned capital improvements "based on [the] Engineer's Opinion of Probable Costs." Exhibit P-003.

16.     Specifically, the 2003 Ordinance assessed $7.475 million in estimated capital improvement costs (i.e. principal). Exhibit P-003.

17.     The interest component of the 2003 Ordinance was an estimate of the total interest that would be paid by the original PID developer to finance the costs of the capital improvements. Exhibit P-003.

18. The interest component of the 2003 Ordinance was calculated as "6% interest for average term of 10 years" on the total projected costs of the capital improvements. Exhibit P-003.

19. The 2003 Ordinance estimated that the PID developer would incur $4.485 million in interest costs. Exhibit P-003.

20. The $4.485 million in estimated capital interest referenced in the 2003 Ordinance was calculated using a 6% simple interest rate on the total capital improvement costs over a 10-year period. Exhibit P-003.

21. The 2003 Ordinance states that the $4.485 million in estimated capital interest "is an estimate based on interest being calculated and collected on actual PID approved reimbursement costs. Costs will be collected over a 25-year period per owner as properties are transferred from Developer to new owner." Exhibit P-003.

22. Therefore, the $4.485 million in estimated capital interest referenced in the 2003 Ordinance was calculated under the assumption that the PID developer borrowed the entire projected costs of the capital improvements (i.e. $7.475 million) on the day the 2003 Ordinance took effect. Exhibit P-003.

23. Under Exhibit C to the 2003 Ordinance, the total "principal only" capital assessment payments on commercial properties were calculated by multiplying the number of square feet comprising a given parcel by $0.094. Exhibit P-003.

24. Under the 2003 Ordinance's SAP, the annual capital assessment payments on commercial properties were calculated by multiplying the number of square feet comprising a given parcel by $0.058. Exhibit P-003.

25. Under Exhibit C to the 2003 Ordinance, the annual capital assessment payments on commercial properties were calculated by multiplying the number of square feet comprising a given parcel by $0.071. Exhibit P-003.

26. Under Exhibit C to the 2003 Ordinance, the total "principal only" capital assessment payments on multifamily properties were calculated by multiplying the number of square feet comprising a given parcel by $0.871. Exhibit P-003.

27. Under the 2003 Ordinance's SAP, the annual capital assessment payments on multifamily properties were calculated by multiplying the number of square feet comprising a given parcel by $0.056. Exhibit P-003.

28. Under Exhibit C to the 2003 Ordinance, the annual capital assessment payments on multifamily properties were calculated by multiplying the number of square feet comprising a given parcel by $0.068. Exhibit P-003.

29. Under Exhibit C to the 2003 Ordinance, the capital assessments on single-family properties were set at a fixed per-lot rate of $6,192 for principal costs, and $2,607 in estimated interest. Exhibit P-003.

30. Under Exhibit C to the 2003 Ordinance, annual capital assessment payments on single-family properties started at $200 per year and increased annually starting in 2009 to $212 per year and up to $641 per year in 2027. Exhibit P-003.

31. The 2003 Ordinance scheduled payments of the capital assessments on all PID properties through 2028. Exhibit P-003.

32. On February 2, 2004, the 2003 Ordinance was recorded as document no. 200401641 in the real property records of Bastrop County. Stipulated Fact 7.

33. At the time the 2003 Ordinance was enacted, the original PID developer owned all of the properties in the PID except for three properties: (i) "HXC-1 (Home Depot Lot 1) (property ID no. 90301); (ii) HXC-1 (Chilis Lot 1) (property ID no. 92325); and (iii) HXC-1 (Balance of Retail Lot 2) (property ID no. 95379). Stipulated Fact 8.

**THE 2004 DEVELOPMENT AND REIMBURSEMENT AGREEMENT**

34. On February 24, 2004, the original PID developer, Sabine Investment Company ("Sabine") entered into a Development and Reimbursement Agreement with the City. Exhibit P-005.

35. Section 4.01 of the Development and Reimbursement Agreement provides: "the City covenants and agrees to levy annual Assessments on property in the PID in accordance with the Service Plan, as the same may be amended from time to time by the [Hunters Crossing Local Government] Corporation with approval of the City." Exhibit P-005.

36. Section 4.04 of the Development and Reimbursement Agreement states:

> Promptly, upon acceptance by the City of the public improvements constructed by Developer as part of the Project, the City agrees to reimburse Developer for such Project Costs paid by Developer, together with interest as provided . . . below, solely from funds actually received by the City from: (a) the Assessments; and/or (b) the net proceeds of PID Bonds in accordance with the terms hereof.

Exhibit P-005.

37. Section 4.04 of the Development and Reimbursement Agreement also provides a method of calculating the interest owed to the developer on unpaid capital assessments:

> <u>Interest Rate</u>. The outstanding amounts due to Developer pursuant to this Agreement shall bear interest on the unpaid principal amount thereof outstanding from time to time at the Prime Rate plus two percent per annum. Interest will accrue from the date of ***each borrowing to pay Project Costs***. As used herein "Prime Rate" means the per annum interest rate as published in the Wall Street Journal.

Exhibit P-005 (emphasis added).

38.     The interest rate stated in the Development and Reimbursement Agreement plainly contemplates that interest only accrues when the developer borrows money to pay for the costs of constructing the capital improvements in the PID. Exhibit P-005.

## THE 2004 ORDINANCE

39.     On November 11, 2004, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on November 23, 2004, to consider an amendment to the 2003 Ordinance. Stipulated Fact 10.

40.     On December 14, 2004, the City passed Ordinance No. 2004-42 (the "2004 Ordinance"). Exhibit P-004.

41.     The 2004 Ordinance was enacted to correct "scrivener's and mathematical errors" in the 2003 Ordinance. Exhibit P-004.

42.     Most importantly, the 2004 Ordinance amended Exhibit C to the 2003 Ordinance by changing the amount of "principal only per square foot" for all commercial properties from $0.094 to $0.904. Exhibit P-004.

43.     In addition, the 2004 Ordinance amended Exhibit C to the 2003 Ordinance by (i) changing tract HXC-1's total square footage from 255,262 to 1,028,147; (ii) increasing tract HXC-1's "total annual assessment" from $18,126.60 to $72,998.44; and (iii) increasing tract HXC-5's "total annual assessment" from $16,218.34 to $17,938.01. Exhibit P-004.

44.     On December 27, 2004, the 2004 Ordinance was recorded as document no. 200420005 in the real property records of Bastrop County. Stipulated Fact 12.

## PLAINTIFF CAROLYN SMITH

45.     Plaintiff Carolyn Smith is an individual residing in Bastrop, Texas, acting as Trustee of the Smith Family Revocable Trust. Stipulated Fact 13.

46.     Carolyn Smith, acting on behalf of the Smith Family Revocable Trust, purchased her residence, a single-family property within the City's Hunters Crossing Public Improvement District, on July 30, 2004. Exhibit P-025.

47.     Carolyn Smith's purchase contract made no mention of the existence of the PID or the PID lien encumbering her single-family property.

48.     Carolyn Smith first discovered the PID assessment encumbering her property when she received her first property tax bill, which included the $200 capital improvement assessment payment for 2005.

49.     When Carolyn Smith asked the City about the $200 annual capital assessment payment, she was given copies of the 2003 and 2004 Ordinances with specific reference to payment schedule in Exhibit C.

50.     Carolyn Smith's residence is identified as property ID no. R95408 in Ordinance No. 2019-40 (the "2019 Ordinance"). Stipulated Fact 14.

**PLAINTIFF LIRTEX PROPERTIES, LLC**

51.     Plaintiff LIRTEX Properties, LLC ("LIRTEX") is a Texas limited liability company doing business in Bastrop, Texas. Stipulated Fact 15.

52.     LIRTEX owns the real property identified as HXC-2 in the 2003 Ordinance, and property ID nos. R114958 and R30102 in the 2019 Ordinance. Stipulated Fact 16.

53.     From 2009 to 2010, property ID no. R114958 totaled 13.738 acres, or 598,427.28 square feet.

54.     In 2011, property ID no. R114958 was subdivided into R114958 and R30102.

55.     From 2011 onward, property ID no. R114958 totaled 7.316 acres, or 318,684.96 square feet.

56.     From 2011 onward, property ID no. R30102 totaled 6.422 acres, or 279,742.32 square feet.

57.     Using the "principal only per square foot" formula found in Exhibit C to the 2003 Ordinance (and subsequently amended by the 2004 Ordinance), the total capital assessment levied at the inception of the PID on property ID no. R114958 is calculated by multiplying the number of square feet comprising property ID no. R114958 (318,684.96) times $0.904. Exhibit P-003.

58.     Therefore, the total capital assessment levied at the inception of the PID on property ID no. R114958 totaled $252,887.06. Exhibit P-003.

59.     Using the "principal only per square foot" formula found in Exhibit C to the 2003 Ordinance (and subsequently amended by the 2004 Ordinance), the total capital assessment levied at the inception of the PID on property ID no. R30102 is calculated by multiplying the number of square feet comprising property ID no. R30102 (279,742.32) times $0.904. Exhibit P-003.

60.     Therefore, the total capital assessment levied at the inception of the PID on property ID no. R30102 totaled $288,091.20. Exhibit P-003.

61.     LIRTEX purchased property ID nos. R114958 and R30102 on December 23, 2015. Exhibit P-021.

62.     Between 2009 and December 23, 2015, Liriano Motors, LLC, leased property ID no. R114958 from Dalh-Bastrop, LP. Under the lease, Liriano Motors, LLC, was responsible for paying the PID assessments on property ID no. R114958.

63.     Between 2011 and December 23, 2015, Liriano Motors, LLC, leased property ID no. R30102 from Dalh-Bastrop, LP. Under the lease, Liriano Motors, LLC was responsible for paying the PID assessments on property ID no. R30102.

64.     On December 23, 2015, LIRTEX purchased property ID nos. R114958 and R30102 from Dalh-Bastrop, LP. Exhibit P-021.

65.     Since December 23, 2015, LIRTEX has leased property ID nos. R114958 and R30102 to Liriano Motors, LLC.

66.     Property ID nos. R114958 and R30102 are classified as commercial properties. Exhibit P-003.

## PLAINTIFF THE VILLAGE AT HUNTERS CROSSING, LLC

67.     Plaintiff The Village at Hunters Crossing, LLC ("VHC") is a Texas limited liability company doing business in Bastrop, Texas. Stipulated Fact 17.

68.     VHC owns portions of the real property identified as HXC-5, HXM-1, and HXP-4 in the 2003 Ordinance, and property ID no. R104899 in the 2019 Ordinance. Stipulated Fact 18.

69.     On May 15, 2015, Howard Schain, the principal of VHC, purchased property ID no. R104899 from Forestar (USA) Real Estate Group ("Forestar"), the original PID developer. Exhibit P-023.

70.     On November 16, 2017, Howard Schain conveyed his property to VHC by special warranty deed. Exhibit P-022.

71.     VHC's parcel HXC-5 is 2.522 acres, or 109,858.32 square feet, and is classified as a commercial property.

72.     VHC's parcel HXM-1 is 9.000 acres, or 392,040.00 square feet, and is classified as a multifamily property.

73.     VHC's parcel HXP-4 is 1.017 acres, or 44,300.52 square feet, and is classified as Parks & Trails.

74.     Together, VHC owns 12.539 acres of land in the PID.

75.     Using the "principal only per square foot" formula found in Exhibit C to the 2003 Ordinance (and subsequently amended by the 2004 Ordinance), the total capital assessment levied at the inception of the PID on VHC's parcel HXC-5 is calculated by multiplying the number of square feet comprising HXC-5 (109,858.32) times $0.904. Exhibit P-003.

76.     Therefore, the total capital assessment levied at the inception of the PID on VHC's parcel HXC-5 totaled $99,311.92. Exhibit P-003.

77.     Using the "principal only per square foot" formula found in Exhibit C to the 2003 Ordinance (and subsequently amended by the 2004 Ordinance), the total capital assessment levied at the inception of the PID on VHC's parcel HXM-1 is calculated by multiplying the number of square feet comprising HXM-1 (392,040.00) times $0.871. Exhibit P-003.

78.     Therefore, the total capital assessment levied at the inception of the PID on VHC's parcel HXM-1 totaled $341,466.84. Exhibit P-003.

## DEFENDANT CITY OF BASTROP

79.     Defendant The City of Bastrop, Texas is a home-rule municipality located in Bastrop County, Texas. Stipulated Fact 19.

## HUNTERS CROSSING LOCAL DEVELOPMENT CORPORATION

80.     Defendant the Hunters Crossing Local Government Corporation ("HCLGC") was incorporated on March 23, 2004. Stipulated Fact 20.

81.     The HCLGC is a public, nonprofit local government corporation formed pursuant to Subchapter D, Chapter 431 of the Texas Transportation Code. *See* TEX. TRANSPORTATION CODE §§ 431.101–431.110; Exhibit P-016.

82.     The HCLGC's Articles of Incorporation provide that the HCLGC "is organized to implement the City-approved Service Plan for the Hunters Crossing Public Improvement District established by the City and to perform such other functions from time to time as lawfully may be delegated to the Corporation by the City." Exhibit P-016.

## THE INDIVIDUAL DEFENDANTS

83.     Defendant Connie Schroeder is sued in her official capacity as Mayor and Council Member of the City of Bastrop. Stipulated Fact 21.

84.     Defendant Willie Lewis "Bill" Peterson is sued in his official capacity as a Council Member of the City of Bastrop. Stipulated Fact 22.

85.     Defendant Drusilla Rogers is sued in her official capacity as a Council Member of the City of Bastrop and in her official capacity as Director of Hunters Crossing Local Government Corporation. Stipulated Fact 23.

86.     Defendant Lyle Nelson is sued in his official capacity as a Council Member of the City of Bastrop and in his official capacity as Director of Hunters Crossing Local Government Corporation. Stipulated Fact 24.

87.     Bill Ennis is sued in his official capacity as a Council Member of the City of Bastrop. Stipulated Fact 25.

88.     Dock Jackson is sued in his official capacity as a Council Member of the City of Bastrop. Stipulated Fact 26.

89.     Paul Hoffman is sued in his official capacity as Director of Hunters Crossing Local Government Corporation. Stipulated Fact 27.

90.     Rick Womble is sued in his official capacity as Director of Hunters Crossing Local Government Corporation. Stipulated Fact 28.

91.     Michelle Dodson is sued in her official capacity as Director of Hunters Crossing Local Government Corporation. Stipulated Fact 29.

92.     Tabitha Pucek is sued in her official capacity as Director of Hunters Crossing Local Government Corporation. Stipulated Fact 30.

**THE ORIGINAL PID DEVELOPER**

93.     At the inception of the PID, the original PID developer was Sabine Investment Company ("Sabine"). Stipulated Fact 31.

94.     Sometime in 2005, Sabine changed its name to Forestar (USA) Real Estate Group, Inc. ("Forestar"). Stipulated Fact 32.

95.     Until 2013, PID property owners were never publically notified that Sabine had changed its name to Forestar. Exhibit P-039.

96.     At the time the 2003 Ordinance was enacted, the original developer owned a majority of the land comprising the PID. Stipulated Fact 33.

97.     The original developer did not make capital assessment payments to the City for the properties that it owned in the PID. Exhibit P-029; Exhibit P-030.

98.     When the original developer sold PID properties to third-party purchasers, the original purchaser's sale price reflected the capital improvements that it had constructed in the PID.

**DEFENDANT TF HUNTERS CROSSING**

99.     Defendant TF Hunters Crossing is a Delaware limited partnership with its principal place of business in Miami, Florida. Stipulated Fact 34.

100.    In February 2018, TF Hunters Crossing executed a contract with the original PID developer, Sabine/Forestar. Stipulated Fact 35; Exhibit P-041.

101.    Pursuant to the TFHC-Sabine/Forestar contract, Sabine/Forestar assigned to TFHC the right to receive all PID developer reimbursements under the 2004 Development and Reimbursement Agreement with the City. Stipulated Fact 36; Exhibit P-041; Exhibit P-0043.

102.    Under the TFHC-Sabine/Forestar contract, TFHC's purchase price for the right to receive PID reimbursements from the City was contingent on the amount of PID reimbursements that TFHC could negotiate with the City:

> If within one (1) year following the Closing Date a legally binding written commitment is obtained with respect to the Hunters Crossing PID Agreement, whereby the district thereunder agrees to pay to TF Hunters Crossing, LP, or its successors or assigns, reimbursements in an amount not less than $5,000,000 from and after the effective date of such binding written commitment, Buyer shall pay to Seller an amount equal to $900,000 within 30 days after the effective date of such commitment.

Exhibit P-041.

103.    On February 7, 2018, pursuant to the TFHC-Sabine/Forestar contract, Sabine/Forestar also conveyed to TFHC by special warranty deed roughly 38 acres of land in the PID. Stipulated Fact 37; Exhibit P-042.

## OPERATION OF THE DISTRICT FROM 2003 TO 2019

104.    In 2005, the original PID developer, Sabine/Forestar, broke ground on PID improvement projects. Stipulated Fact 38.

105.    Neither the City nor the HCLGC has incurred any project costs for capital improvements associated with the PID. Stipulated Fact 39.

106.    The City has never issued bonds in connection with the PID. Stipulated Fact 40.

107.    The City never issued a time warrant or temporary note to the PID developer to fund the construction of capital improvements. Stipulated Fact 41.

108.    Until the original PID developer sold its interest in the PID to TFHC in 2018, the original developer never borrowed any money from the City to pay for capital improvement project costs associated with the PID. Stipulated Fact 42.

109.    TFHC has never borrowed any money from the City to pay for capital improvement project costs associated with the PID. Stipulated Fact 43.

110.    The City did not, at any time from 2005 through August 2019, update or amend the 2003 Ordinance, or adopt a new ordinance governing the PID, to include capital improvement expenditures incurred or spent by the PID developer from 2005 through 2018. Stipulated Fact 44; Exhibit P-066.

111.    In 2011, the HCLGC commissioned an independent accountant, Singleton, Clark & Company, PC ("Singleton") to perform an Analysis of Developer Costs from July 1, 2007 to June 30, 2010 (the "Singleton Report"). Stipulated Fact 45; Exhibit P-018.

112.    The HCLGC tasked Singleton with (i) reviewing the developer's documentation of specific capital improvements constructed in the PID; (ii) identifying capital improvements that qualified for reimbursement by the City, and (iii) comparing the 2003 Ordinance's initial assessments against the actual costs of capital improvements in the PID that had been incurred by the developer. Exhibit P-018.

113.   The procedures Singleton used to perform these calculations "were agreed to by the management of Hunters Crossing Local Government Corporation and the management of Forestar Group, Inc." Exhibit P-018.

114.   The Singleton Report was issued to the HCLGC and City on July 12, 2011, but was never made available to the public or PID property owners. Exhibit P-018.

115.   When the Singleton Report was issued on July 12, 2011, the original developer had completed the majority of all capital improvement projects in the PID. Stipulated Fact 46.

116.   The Singleton Report included a chart "compar[ing] the preliminary engineering estimate from the City of Bastrop ordinance regarding Hunters Crossing [the 2003 Ordinance] with actual costs through June 30, 2010." Exhibit P-018.

117.   This chart was subsequently used by the City to calculate the capital assessments in the 2019 Ordinance. Exhibit P-018; Exhibit P-009.

118.   The Singleton Report found that, by June 30, 2010, the original PID developer had incurred $13,529,608 in principal capital improvement costs. Exhibit P-018

119.   The Singleton Report subtracted the 20% "developers contribution" from the developer's actual capital expenditures of $13,529,608 and concluded that the developer's "[c]apital recovery amount before interest" totaled $10,823,686. Exhibit P-018.

120.   The Singleton Report therefore concluded that, by June 30, 2010, the developer was entitled to $10.824 million in principal capital improvement reimbursements, rather than the $7.475 million that was estimated in the 2003 Ordinance. Exhibit P-018.

121.   On top of the $10,823,686 in purported capital recovery, the Singleton Report added $6,494,212 in interest, which was "[e]stimated at 60% of Capital Recovery amount before interest." Exhibit P-018.

122.   Specifically, Singleton calculated the $6,494,212 in interest using an "[i]nterest capitalization rate of 6% for 10 years," the same rate that was stated in the 2003 Ordinance. Exhibit P-018.

123.   Together, the Singleton Report concluded that, as of June 30, 2010, the developer's "[t]otal net capital recovery amount" equaled $17,317,898. Exhibit P-018.

124.   In calculating the developer's purported interest costs, the Singleton Report's methodology made three errors.

125.   First, although the Singleton Report claimed to calculate actual interest costs incurred by the developer through June 30, 2010, it did not reconcile the 2003 Ordinance's estimated interest calculation against any actual interest paid by the developer in financing the capital improvement projects. Exhibit P-029; Exhibit P-030.

126.   The Singleton Report's methodology reconciled the developer's actual principal improvement costs against the original estimates, but did not reconcile the developer's

actual borrowing costs, which were zero, against the original estimates. Exhibit P-029; Exhibit P-030.

127.    According to the Singleton Report, roughly 38% of the "actual" costs incurred by Forestar through June 30, 2010 were not actuals and were not reconciled against the original estimates in the 2003 Ordinance, despite the fact that the remaining 62% of principal improvement costs were reconciled against the original estimates. Exhibit P-029; Exhibit P-030.

128.    Second, the Singleton Report's calculation of the developer's purported interest costs falsely assumed that the developer borrowed the full $10,823,686 in purported capital recovery on the day that PID construction projects commenced. Exhibit P-029; Exhibit P-030.

129.    Third, the Singleton Report's calculation of the developer's purported interest costs incorrectly applied the interest capitalization rate of 6% for a ten-year period, despite the fact that the period in which the developer actually incurred principal capital improvement costs was no more than 6 years. Exhibit P-029; Exhibit P-030.

130.    Taken together, this meant that the Singleton Report's calculations inflated the developer's purported interest costs, and subsequently, the developer's "[t]otal net capital recovery amount." Exhibit P-018.

131.    The Singleton Report also establishes that, no later than July 12, 2011, the City and HCLGC were aware that by June 30, 2010, the original developer had incurred $3,347,899 more in actual principal improvement costs than was contemplated under the 2003 Ordinance. Exhibit P-018.

## HCLGC REVIEWS THE 2003 SAP

132.    In each year between 2012 and 2016, the HCLGC held board meetings in which it purported to review and approve the 2003 service and assessment plan. Exhibit P-010; Exhibit P-011; Exhibit P-012; Exhibit P-013; Exhibit P-014; Exhibit P-015.

133.    In each of these years, the HCLGC purported to approve the 2003 capital assessments without adjustment, despite the fact that the developer had incurred capital improvement costs that far exceeded the 2003 Ordinance's estimates. Exhibit P-010; Exhibit P-011; Exhibit P-012; Exhibit P-013; Exhibit P-014; Exhibit P-015.

134.    The meeting minutes of the September 23, 2013 HCLGC Board Meeting state: "The Capital assessment for a single family and commercial current property remains consistent and was previously approved through the Services and Assessment Plan prepared in November 2003. There is no proposed change to the Service and Assessment Plan." Exhibit P-010.

135.    The meeting minutes of the September 23, 2013 HCLGC Board Meeting also state: "the PID expires in 2027/2028 by which time the Developer will have conveyed all of the public

improvements to the City and the ongoing operating and maintenance will then be paid for and managed by the City." Exhibit P-010.

136. The meeting minutes of the September 23, 2013 HCLGC Board Meeting also state: "No increase in the capital component of the PID expenditures has ever been requested or approved." Exhibit P-010.

137. The meeting minutes of the September 23, 2013 HCLGC Board Meeting also state: "The City has not been asked to take any action that might extend the life of the PID beyond that approved by the City Council and it is uncertain at this time, whether any extension is allowed by law, but none has been sought in this case." Exhibit P-010.

138. The meeting minutes of the September 23, 2013 HCLGC Board Meeting also state: "As of June 30, 2010 the Developer's current debt (or capital cost) had increased to $17,317,898. However, the current Service & Assessment Plan has not been amended nor is an amendment proposed for fiscal year 2014." Exhibit P-010.

139. Also in 2013, HCLGC board member and Bastrop City Council member Ken Kesselus held a Q&A session with PID property owners ("the 2013 Q&A"). Exhibit P-039.

140. At the 2013 Q&A, in response to questions about PID debt, Mr. Kesselus responded:

> There is no debt to the City. All of the project debt is carried by and owed only by the Developer, i.e., Forestar, the successor to Sabine. Accordingly, no specifics on debt retirement are available. The capital costs and their assessment schedules are available in the Service and Assessment Plan, prepared in November 2003. . . . Neither the City nor the PID are paying any interest nor do either hold any debt for the PID. Forestar would be the only party responsible for paying their debt and the associated interest.

Exhibit P-039.

141. The 2013 Q&A was the first time that the City publically notified PID property owners that Sabine had changed its name to Forestar. Exhibit P-039.

142. At the 2013 Q&A, Mr. Kesselus was asked: "If there is debt left at the end of the PID, who assumes responsibility for paying the debt?" Mr. Kesselus responded: "Forestar is responsible for paying any debt that is left at the end of the PID." Exhibit P-039.

143. The meeting minutes of the September 24, 2014 HCLGC Board Meeting reflect that a board member "moved to approve the Hunters Crossing Local Government Resolution approving and adopting the annual budget for Fiscal Year 2015, providing reimbursement for historical Capital expenditures[.]" Exhibit P-012.

144. The meeting minutes from the August 17, 2015 HCLGC Board Meeting state: "the City cannot control the Capital fund because it is set by the service agreement, the only control the City has is on the O&M side." Exhibit P-013.

145.　The July 26, 2017 HCLGC Meeting Agenda includes an internal HCLGC financial summary through June 30, 2017. Exhibit P-026.

146.　The internal HCLGC financial summary dated June 30, 2017 states that for FY 2016-2017 and FY 2017-2018, the City assessed capital costs on commercial properties at $0.071 per square foot, which is consistent with Exhibit C to the 2003 Ordinance. Exhibit P-026.

147.　The June 30, 2017 internal HCLGC financial summary states that for FY 2016-2017 and FY 2017-2018, the City assessed capital costs on multifamily properties at $0.068 per square foot, which is consistent with Exhibit C to the 2003 Ordinance. Exhibit P-026.

148.　The June 30, 2017 internal HCLGC financial summary states that for FY 2016-2017 and FY 2017-2018, the City assessed capital costs on single family properties at $338.00 per lot, which is consistent with Exhibit C to the 2003 Ordinance. Exhibit P-026; Exhibit P-003.

149.　Exhibit C to the 2003 Ordinance lists $338 as the annual capital assessment payment for single family properties in 2017, an amount that includes both the principal amount of the capital improvement costs as well as the estimated 6% interest rate. Exhibit P-003.

150.　The June 30, 2017 internal HCLGC financial summary states that for FY 2016-2017, the annual budget for total capital improvement funds received equals $280,747.00. Exhibit P-026.

151.　The June 30, 2017 internal HCLGC financial summary states that for FY 2017-2018, the proposed annual budget for total capital improvement funds received equals $295,585.00. Exhibit P-026.

## THE CITY COUNCIL BEGINS TO CONDUCT THE ANNUAL REVIEW OF THE SAP IN THE FALL OF 2017

152.　On September 28, 2017, the City Council reviewed the 2003 service and assessment plan for the first time since 2004. Exhibit P-006.

153.　Pursuant to Ordinance No. 2017-26, the City Council approved the capital assessments component of the SAP. Exhibit P-006.

154.　Ordinance No. 2017-26 states that "[t]he City Council of the City of Bastrop hereby finds that the capital assessment roll as included in Exhibit A attached hereto and incorporated in this Ordinance, which relates solely to the original historic capital costs, continues to be correct as set forth in the original Service Plan and should not be changed, and the City Council approves Exhibit A as the Fiscal Year 2018 capital assessment roll of the Hunters Crossing PID." Exhibit P-006.

155.　Therefore, while Ordinance No. 2017-26 approved the capital assessments component of the 2003 SAP, the City Council did not adjust the capital assessments to incorporate the original developer's overrun capital improvement expenditures. Exhibit P-006.

156.   Ordinance No. 2017-26 was the first time that the City Council had approved the 2003 SAP's capital assessments component since 2004. Exhibit P-006.

157.   On September 25, 2018, the City Council reviewed the 2003 service and assessment plan. Exhibit P-007.

158.   Pursuant to Ordinance No. 2018-24, the City Council approved the capital assessments component of the 2003 SAP. Exhibit P-007.

159.   Ordinance No. 2018-24 states that "[t]he City Council of the City of Bastrop hereby finds that the capital assessment roll as included in Exhibit A attached hereto and incorporated in this Ordinance, which relates solely to the original historic capital costs, continues to be correct as set forth in the original Service Plan and should not be changed, and the City Council approves Exhibit A as the Fiscal Year 2019 capital assessment roll of the Hunters Crossing PID." Exhibit P-007.

160.   Therefore, while Ordinance No. 2018-24 approved the capital assessments component of the 2003 SAP, the City Council did not adjust the capital assessments to incorporate the original developer's overrun capital improvement expenditures. Exhibit P-007.

**TF HUNTERS CROSSING PURCHASES SABINE/FORESTAR'S INTEREST IN THE PID AND WORKS WITH THE CITY TO REVISE THE 2003 SAP**

161.   In February 2018, the original developer (Sabine/Forestar) sold to Defendant TFHC (i) its interests in PID reimbursements for $900,000, so long as TFHC was able to successfully negotiate with the City a commitment for $5 million or more in capital reimbursements; and (ii) roughly 38 acres of undeveloped land situated in the PID. Exhibit P-041; Exhibit P-042; Exhibit P-043.

162.   Soon after TFHC purchased its interest in capital PID reimbursements, TFHC began to work with the City on a "proposed reconciliation" of the PID.

163.   In March 27, 2018, in an email exchange between, TFHC's non-litigation counsel, Misty Ventura, and VHC's non-litigation counsel, Robert Reetz, Ms. Ventura told Mr. Reetz that TFHC had "finally sorted through the bulk of the PID documents and we are close to finalizing an assessment role (sic.) that confirms for all owners amounts levied, amounts paid and amounts owed for capital assessments." Exhibit P-045.

164.   In the March 27, 2018 email exchange, Ms. Ventura also indicated that (i) the total capital assessments levied under the 2003 Ordinance against VHC's property ID no. 104899 equaled $354,859.93; (ii) the capital assessment payments already completed on VHC's property ID no. 104899 equaled $55,408.67; and (iii) the total remaining capital assessment payments owed under the 2003 Ordinance against VHC's property ID no. 104899 equaled $299,451.26. Exhibit P-045.

165.   In the March 27, 2018 email exchange, Ms. Ventura also indicated that, in calculating VHC's capital assessments, she applied a 7.85% interest rate. Exhibit P-045.

166. In the March 27, 2018 email exchange, when Mr. Reetz asked Ms. Ventura how she arrived at a 7.85% interest rate, Ms. Ventura responded: "I backed into the interest based on the difference between the amount levied and the installment payments." Exhibit P-045.

167. On April 17, 2018, Ms. Ventura sent George Hyde, the City's counsel, the proposed reconciliation, which included a "PID assessment role (sic.) that summarize[d] the assessment levied, the amounts collected, and the amounts owed" on the PID. Exhibit P-028.

168. In the April 17, 2018 email to Mr. Hyde, Ms. Ventura stated that "[b]ased on the amounts owed and interest from installment payments, I believe TF Hunters Crossing, L.P. is owed $11,074,604.74 ($6,203,512.92 PID principal payments from unpaid assessments plus $4,871,091.82 interest)." Exhibit P-028.

169. In the April 17, 2018 email to Mr. Hyde, Ms. Ventura further stated "[w]hen you compare the amount levied to the installment payment, it appears an interest rate of 7.85% was included with installment payments." Exhibit P-028.

170. In response to Ms. Ventura's April 17, 2018 email, Mr. Hyde expressed concern regarding the 7.85% interest rate utilized by TFHC in the "proposed reconciliation":

> Interest Rate – PID Documentation set an interest rate of prime plus two percent. Your footnote appears to apply a linear interest rate of 7.85%, PID audit documents reference a linear 5%. We need to resolve this.

Exhibit P-028.

171. In response to Ms. Ventura's April 17, 2018 email, Mr. Hyde also expressed concern regarding the assessment trigger put forth by TFHC in the "proposed reconciliation":

> Assessment Trigger – How do you statutorily reconcile the application of the "Assessment Trigger" referenced in footnote 1 in your Capital Assessment Roll attachment? (The footnote also does not reflect the secondary transfer trigger in the PID documents applicable for residential property).

Exhibit P-028.

172. In response to Ms. Ventura's April 17, 2018 email, Mr. Hyde also expressed concern regarding the method of apportionment utilized in TFHC's "proposed reconciliation":

> As you know, [Texas Local Government Code] § 372.015 governs apportionment. . . . ***Who owns the property in a PID has no impact whatsoever to diminish or enhance the benefit of PID improvements to property in the PID. Once can easily foresee how such a provision is not statutorily compliant.*** If one were to take the assessment trigger to its logical conclusion, the developer of this PID could maintain ownership of property in the PID, which is benefited by PID improvements, and be

entirely free from any obligation to pay an equal share of the cost., as required by Texas law. Furthermore, the prolonged delay disproportionately shifts more cost for the PID improvements on property owners who enter the PID first, lessening the share of the cost to those who purchase property at the end of the PID.

Exhibit P-028 (emphasis added).

173. In response to Ms. Ventura's April 17, 2018 email, Mr. Hyde, Mr. Hyde promised to "conduct a comparative analysis and work with [Ms. Ventura] on any issue that we find conflict with." Exhibit P-028.

174. On July 12, 2018, Mr. Hyde sent another email to Ms. Ventura in which he notified Ms. Ventura that the City had engaged an independent certified public accountant to evaluate the finances of the PID. Exhibit P-032.

175. In the July 12, 2018 email, Mr. Hyde told Ms. Ventura that "our final figures are going to be several million dollars less than what you proposed." Exhibit P-032.

176. In his July 12, 2018 email, Mr. Hyde further advised Ms. Ventura: "I would like you to start preparing your client for the realization that the reimbursement value in the project may be much different than your calculations. I suggest we should consider an all-day mediation . . . to determine whether there is any chance to find compromise[.]" Exhibit P-032.

177. On February 6, 2019, TFHC's non-litigation counsel, Roxanne Sheehan, sent an email to George Hyde that included a chart entitled "Comparison of Assessments Between Original and Amended Ordinances." Exhibit P-074.

178. For commercial PID properties, the chart indicated that the assessments under the "Original Assessments" (i.e. 2003 Ordinance) totaled $1,775,276.64, whereas the "Amended Assessments" totaled $2,199,114.74, for a total "Increase in Assessments" of $423,838.10. Exhibit P-073.

179. For multifamily PID properties, the chart indicated that the assessments under the "Original Assessments" (i.e. 2003 Ordinance) totaled $485,227.21, whereas the "Amended Assessments" totaled $933,129.25, for a total "Increase in Assessments" of $447,902.04. Exhibit P-073.

180. For undeveloped PID properties, the chart indicated that the assessments under the "Original Assessments" (i.e. 2003 Ordinance) totaled $0, whereas the "Amended Assessments" totaled $2,701,151.74, for a total "Increase in Assessments" of $2,701,151.74. Exhibit P-073.

**THE GLASS MEMO**

181. On July 20, 2018, Glass & Company, an accounting firm hired by the City, issued a memo (the "Glass Memo") in which it "prepared . . . calculations regarding the amount of

reimbursement of capital costs due to the developer of the Hunters Crossing Public Improvement District[.]" Exhibit P-027.

182. The Glass Memo's calculations were based on the 2003 Ordinance's "Service and Assessment plan (SAP), related resolutions, and the Bastrop Central Appraised District records." Exhibit P-027.

183. The Glass Memo "calculated the Maximum Net Capital Assessment Available for Reimbursement as of the date of this Report [July 20, 2018]." Exhibit P-027.

184. Based on the 2003 Ordinance, the Glass Memo concluded that "the only source of reimbursement for capital costs is the capital assessments levied on the property owners." Exhibit P-027.

185. The Glass Memo concluded that "[t]he [2003] SAP set forth the assessment rates, which have never been amended." Exhibit P-027.

186. The Glass Memo concluded that "no bonds have been issued to be used as a source of repayment." Exhibit P-027.

187. Based on the 2003 Ordinance, the Glass Memo concluded that the PID's total capital assessments equaled $6,136,190.85. Exhibit P-027.

188. The Glass Memo concluded that "[t]otal capital assessments of $6,136,190.85 are reduced by payments that have already been made to the developer for capital reimbursement of $1,881,597.71. Exhibit P-027.

189. Taken together, the Glass Memo concluded that "this produces a Maximum Net Capital Assessments Available for Reimbursement of $4,254,593.14," a sum that reflected "all assessments to-date plus future assessments based on actual property that is presently being assessed." Exhibit P-027.

190. The Glass Memo also "reconciled the developer's [TFHC] analysis of the amounts owed to the developer [$11,074,604.74] to the [$4,254,593.14] available for reimbursement[.]" Exhibit P-027.

191. In performing this reconciliation, the Glass Memo pointed out a number of flaws in TFHC's methodology. Exhibit P-027.

192. For example, the Glass Memo concluded that "[t]he developer's calculation of $11,074,604.74 represents the total amount owed without consideration of when the properties came onboard whereas the $4,248,273.54 represents the actual amount of assessments available according to when the properties actually came on board. The difference is attributable to the delay in developer's or builder's sales." Exhibit P-027.

193. According to the Glass Memo, this meant that "the developer's calculation did not consider the timing of when the individual parcels were conveyed and assessments started or that the PID's term of 25 years ends in 2028." Exhibit P-027.

194.   The Glass Memo also criticized TFHC's claim to $4,871,091.82 in interest reimbursement, stating that "[t]he assessments already include principal and interest according to the [2003] SAP eliminating the need for a separate interest calculation made by the developer." Exhibit P-027.

## THE CITY'S COLLECTION OF CAPITAL ASSESSMENTS FROM PID PROPERTY OWNERS

195.   As of September 24, 2019, the City collected an aggregate of $2,205,097.71 in capital assessments from all PID property owners, the entirety of which was paid to the PID developer pursuant to the Development and Reimbursement Agreement. Exhibit P-009; Stipulated Fact 52..

196.   Section 5 of the 2003 Ordinance provides that "[t]he first annual PID assessments on commercial and multifamily property located in the PID shall be due on the last to occur of the following two events: (a) the effective date of this Ordinance; or (b) the date that ownership of the tract or lot of land located in the PID is transferred from [the original developer] Sabine Investments, Inc. The first annual assessments on single-family property located in the PID shall be due on the date that the property is transferred to the homeowner." Exhibit P-003.

197.   Pursuant to Section 5 of the 2003 Ordinance, the original developer did not pay annual assessments on the properties it owned in the PID. Exhibit P-003; Exhibit P-029.

198.   For each PID property, the triggering event for which corresponding annual PID assessment payments began to accrue was the date on which the original developer sold that property to a third-party owner. Exhibit P-003.

199.   For example, from the creation of the PID until May 15, 2015, when Forestar sold property ID no. R104899 to VHC's principal Howard Schain, Forestar did not directly pay capital assessments on property ID no. R104899. Exhibit P-029.

200.   According to the 2003 Ordinance, from the May 15, 2015 triggering date onward, the total remaining capital assessments on property ID no. R104899 reflected the total amount levied under the 2003 Ordinance, without consideration of the fact that Forestar had owned the parcel for some twelve years. Exhibit P-003; Exhibit P-029.

201.   From the inception of the PID until September 24, 2019, the Bastrop County Tax Assessor collected PID assessment payments by property ID, purportedly based on either the 2003 Ordinance's flat single-family lot rate or the assessment per square foot calculus for commercial or multifamily properties as set forth in the 2003 Ordinance (and amended by the 2004 Ordinance). Exhibit P-034; Exhibit P-035; Exhibit P-036.

202.   From the inception of the PID until September 24, 2019, the Bastrop County Tax Assessor collected PID assessments by property ID. Stipulated Fact 53.

203. However, the annual assessment installments were identified as one aggregate sum that included both the annual capital assessment installment and the annual operations and maintenance ("O&M") assessment installment. Stipulated Fact 54.

204. In other words, for each PID parcel's annual assessment payment, the Bastrop County Tax Assessor did not inform the corresponding PID property owner of the breakdown between capital assessment and O&M assessment components of the property owner's total annual assessment.

205. Prior to the enactment of the 2019 Ordinance, the Bastrop County Tax Assessor did not maintain master reports of capital assessment payments by parcel, despite the fact that they were made to accounts tied to each distinct property ID. Exhibit P-035.

206. Therefore, prior to the enactment of the 2019 Ordinance, it was impossible for PID property owners (or the public at large) to independently determine the total outstanding amount of capital assessment payments on the parcels that they owned.

207. On June 23, 2017, Jean Riemenschneider, the Economic Development Project Manager of the Bastrop Economic Development Corporation, sent an email to the City inquiring how she could "find[] out how much is left on the PID contract for Hunters Crossing, and is it per site or as a whole development?" Exhibit P-036.

208. On June 26, 2017, the City' Chief Financial Officer, Tracy Waldron, responded to Ms. Riemenschneider's inquiry, stating that the "PID documents are vague and unclear . . . so in a nut shell, I'm not sure." Exhibit P-036.

209. Yet, in the June 26, 2017 email, Ms. Waldron also told Ms. Riemenschneider: "If you ever have a potential buyer interested, I can calculate what the assessment would be on any parcel." Exhibit P-036.

210. Also in June 2017, Ms. Waldron sent an invoice to a new multifamily property owner – MacDonald & Associates, Inc. ("MacDonald") – that "calculate[d] the prorated amount due" on MacDonald's parcel "for 2017." Exhibit P-037.

211. Specifically, the invoice showed that the 2017 annual capital assessment payment on MacDonald's property was $35,498, which was calculated by multiplying $0.068 (the per square foot rate listed in Exhibit C to the 2003 Ordinance) by 522,023 (the number of square feet comprising MacDonald's property). Exhibit P-037.

212. The invoice also prorated MacDonald's 2017 capital assessment payment, meaning that MacDonald was only responsible for the portion of the annual capital assessment from May 24, 2017 (when MacDonald purchased the property) through December 31, 2017. Exhibit P-037.

213. Between 2017 and 2018, MacDonald sought and received a payoff amount for the total remaining capital assessment on its property from Misty Ventura, TFHC's non-litigation counsel. Exhibit P-038.

214.    On March 27, 2018, Ms. Ventura sent an email to MacDonald in which she calculated that, under the 2003 Ordinance, the total capital assessments levied on MacDonald's property equaled $454,682.07. Exhibit P-038.

215.    In the March 27, 2018 email, Ms. Ventura identified a specific amount of capital assessment levied for MacDonald's parcel within the PID (property ID no. R113268) and did not state that the capital assessment was levied against the entire 283 acres of the PID. Exhibit P-038.

**PLAINTIFFS' CAPITAL ASSESSMENT PAYMENTS**

216.    Plaintiff Carolyn Smith acquired her property in 2004 and started paying annual capital assessments in 2005.

217.    As of September 24, 2019 (the day the City enacted the 2019 Ordinance), the City collected an aggregate of $3,804 in capital assessments from Plaintiff Carolyn Smith. Exhibit P-029.

218.    At the time of trial, the City collected an aggregate of $4,574.83 in capital assessments from Plaintiff Carolyn Smith. Exhibit P-029.

219.    Liriano Motors, LLC, began leasing property ID no. R114958 from Dalh-Bastrop, LP in 2009. Under the triple net lease, Liriano Motors, LLC, was responsible for paying all PID assessments on property ID no. R114958.

220.    In 2011, Dalh-Bastrop, LP subdivided a portion of property ID no. R114958 into property ID no. R30102. Upon subdivision, Liriano Motors, LLC, leased both property ID nos. R114958 and R30102 and was obligated to pay all PID assessments on both properties.

221.    On December 23, 2015, Plaintiff LIRTEX purchased property ID nos. R114958 and R30102 from Dalh-Bastrop, LP.

222.    As of September 24, 2019, the City had collected an aggregate of $559,121 in capital assessments from property ID nos. R114958 and R30102, all of which was paid by Plaintiff LIRTEX or its related entity Liriano Motors, LLC d/b/a Lost Pines Toyota. Exhibit P-029.

223.    From 2009 to 2013, property ID no. R114958 was annually assessed double the applied per square foot rate stated in Exhibit F to the 2003 SAP for capital costs, or $0.116 per square foot. Exhibit P-029.

224.    From 2011 to 2013, property ID no. R30102 was annually assessed double the applied per square foot rate stated in Exhibit F to the 2003 SAP for capital costs, or $0.116 per square foot. Exhibit P-029.

225.    From 2013 to 2015, both property ID nos. R114958 and R30102 were annually assessed $0.058 per square foot for capital costs, which corresponds with the stated per square foot rate in Exhibit F to the 2003 SAP for capital costs. Exhibit P-029.

226. From 2016 to 2019, both property ID nos. R114958 and R30102 were annually assessed $0.071 per square foot for capital costs, which corresponds with the stated rate in Exhibit "C" to the 2003 Ordinance. Exhibit P-029.

227. At the time of trial, the City collected an aggregate of $644,097.28 in capital assessments on property ID nos. R114958 and R30102 from Plaintiff LIRTEX and its predecessor Dalh-Bastrop, LP. Exhibit P-029.

228. Plaintiff VHC acquired its property and started paying annual capital assessments in 2015.

229. As of September 24, 2019, the City collected an aggregate of $115,067.00 in capital assessments from Plaintiff VHC. Exhibit P-029.

230. During this period, the rate used by the City to calculate annual capital assessments on VHC's property ID no. R104899 does not correspond with any of the per square foot rates identified in either Exhibit C to the 2003 Ordinance or the 2003 Ordinance's SAP. Exhibit P-029.

231. At the time of trial, the City collected an aggregate of $192,158.97 in capital assessments on property ID no. R104899 from Plaintiff VHC or its principal Howard Schain. Exhibit P-029.

232. Prior to 2019, the actual assessments levied against the LIRTEX and VHC properties do not reconcile with the annual assessments indicated by the per square foot rates in the 2003 Ordinance (as amended by the 2004 Ordinance). Exhibit P-029.

233. In January 2019, Robert Reetz contacted George Hyde to obtain a payoff amount of VHC's remaining capital assessments. Exhibit P-064.

234. Mr. Hyde informed Mr. Reetz that a payoff amount was not available at that time because the City was negotiating a resolution with TFHC, but that once their resolution had been reached, he could provide VHC with a payoff amount. Exhibit P-064.

235. Mr. Reetz spoke with Mr. Hyde again on May 6, 2019, however Mr. Hyde again refused to provide VHC with the sum that VHC would have to pay to obtain a payoff of its capital assessment lien. Exhibit P-064.

236. On July 2, 2019, Mr. Reetz emailed Mr. Hyde to again obtain a payoff amount for VHC's remaining capital assessments. Exhibit P-064; Exhibit P-075.

237. In response to Mr. Reetz's July 2, 2019 email, Mt. Hyde again refused to inform VHC of the total remaining amount due on its capital assessments. Exhibit P-064; Exhibit P-075.

238. On September 19, 2019, just several days before the enactment of the 2019 Ordinance, Mr. Hyde sent a letter to Mr. Reetz regarding the payoff amount for VHC's remaining capital assessments:

> Should you wish to pay off the assessment lien at the amount owed prior to the adoption of the September 24, 2019 adopted SAP, it would dispose of

2028610.v1

the lien on all 283.001 acres, and the unpaid portion of that lien is $9,362,428.01

Exhibit P-033.

## THE CITY NEVER COLLECTED INTEREST ON PID ASSESSMENTS

239. Defendants have judicially admitted that, during the entire life of the PID, the City has never collected interest on PID assessment payments from PID property owners. Exhibit P-066.

240. Relatedly, Defendants contend that (i) "[i]nterest did not make up a single dime of the 2003 assessment . . . because actual capital costs (i.e. the roads, bridges, drainage culverts, etc. in the Hunters Crossing subdivision) exceeded $11.962 million"; (ii) "every penny of the 2003 assessment . . . is made up of hard construction costs"; and (iii) "interest could not have made up any portion of the 2003 assessment." Dkt. 94 at ¶ 16.

241. On September 10, 2018, Ms. Ventura sent Mr. Hyde an email attached with a "restated service and assessment plan (SAP)" which Ms. Ventura asserted "could be adopted by Bastrop as this year's update." Exhibit P-046.

242. In her September 10, 2018 email, Ms. Ventura also raised the issue of the mandatory procedures required of the City under the PIDA Act. She said:

> We need to consider whether a public hearing is needed to support future SAP approvals and if such a hearing is needed whether it must comply with the mailing and publication requirements of Chapter 372. One thought is no public hearing is required for an annual SAP update because no assessment is being levied. Instead, the amounts levied in 2003 and revised in 2004 were the only amounts levied and all that is changed in the annual SAP update is the collection mechanics for payment of annual installments and O&M budgets. An alternative approach is that Chapter 372 public hearings are required because the O&M portion of each payment is levied annually.

Exhibit P-046.

243. On February 5, 2019, Mr. Hyde sent an email to Ms. Ventura in which he concluded that "this is a zero interest PID." Exhibit P-049.

244. In the February 5, 2019 email to Ms. Ventura, Mr. Hyde concluded that because Section 4.04 of the Development and Reimbursement Agreement "specifically states that interest will accrue from the date of each borrowing to pay Project Costs and there has been no borrowing, the PID costs have not been subject to interest at all and are not subject to interest until and unless there is a 'borrowing' (PID DEBT) to pay Project Costs." Exhibit P-049.

245.  In the February 5, 2019 email to Ms. Ventura, Mr. Hyde further concluded that "the payment schedule for residential actual (sic.) results in an overpayment at $8,799 and must be reduced to $6,192 as its total[.]" Exhibit P-049.

246.  Later on February 5, 2019, Mr. Hyde sent Ms. Ventura his latest draft of the revised SAP. Exhibit P-049.

247.  In his February 5, 2019 email to Ms. Ventura, Mr. Hyde admitted that the "fact is that this PID can probably be invalidated pursuant to [Chapter] 372 [of the Texas Local Government Code] because of its defects, and we are trying to give it a heart transplant and brain transplant to resolve these amicably." Exhibit P-049.

248.  In response to Mr. Hyde's February 5, 2019 email, Ms. Ventura stated: "if the economics work, the history is irrelevant." Exhibit P-049.

249.  On July 31, 2019, George Hyde emailed Misty Ventura to reconcile their position on the different per parcel capital assessment amounts for single family properties stated in the 2003 Ordinance: $8,799 vs. $6,192. Exhibit P-062.

250.  Ms. Ventura responded to Mr. Hyde's July 31, 2019 email: "Perhaps the best way to invalidate the $6,192 amount is to make clear that the option to pay this reduced amount expired when each owner began making installment payments on the $8,799." Exhibit P-062.

251.  Mr. Hyde replied to Ms. Ventura: "This works and is supported" and "We need to address each of the sections in this manner so we can explain where the savings occur in the commercial and multi-family." Exhibit P-062.

**THE 2019 ORDINANCE**

252.  On August 19, 2019, the City hosted a town hall meeting to review the proposed 2019 amended and restated service and assessment plan ("2019 SAP"). Stipulated Fact 55.

253.  At the August 19, 2019 town hall meeting, the City provided PID property owners with a four-page pamphlet (the "Town Hall Pamphlet") explaining the impetus behind the 2019 Ordinance as well as its contents. Stipulated Fact 56; Exhibit P-019.

254.  The Town Hall Pamphlet informed PID property owners that "annual updates to the Hunters Crossing PID's SAP have not occurred. The original Service and Assessment Plan (SAP), which was adopted December 9, 2003, has never been amended." Exhibit P-019.

255.  The Town Hall Pamphlet also stated that "[t]he developer should have been required to pay PID fees annually on developer-owned property until sold for development." Exhibit P-019.

256.  The Town Hall Pamphlet informed PID property owners that "[a]t the conclusion of tonight's meeting, the Revised & Amended Service and Assessment Plan will be posted on the City's website[.]" Exhibit P-019.

257.    Neither the Town Hall Pamphlet nor the 2019 town hall meeting provided notice to PID property owners that the 2019 Ordinance would violate the PIDA Act by adjusting the capital assessments to incorporate the original developer's historical capital improvement overrun expenditures. Exhibit P-019.

258.    On August 31, 2019, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on September 10, 2019 to consider the 2019 annual review of the service and assessment plan. Stipulated Fact 57.

259.    On September 10, 2019, the City approved the first reading of Ordinance No. 2019-40 (the "2019 Ordinance"), which approved the 2019 SAP and revised assessment roll. Stipulated Fact 58; Exhibit P-009.

260.    On September 12, 2019, the City published notice in the *Bastrop Advertiser* of a public hearing to be held on September 24, 2019 to consider the annual review of the 2019 annual review of the service and assessment plan. Stipulated Fact 59.

261.    On September 24, 2019, the City adopted the 2019 Ordinance. Stipulated Fact 60.

262.    The 2019 Ordinance provided that the City had reimbursed TFHC (through its predecessor-in-interest Sabine/Forestar) a total of $2,205,097.71 in capital assessments. Exhibit P-009.

263.    The 2019 Ordinance extends the scheduled payments of the capital assessments on commercial and multifamily properties. Exhibit P-009; Exhibit P-003.

264.    Specifically, the scheduled payments of the capital assessments on commercial properties are extended from 2028 (under the 2003 Ordinance) through 2034 and capital assessments on multifamily properties are extended from 2028 through 2041. Exhibit P-009; Exhibit P-003.

265.    Under the 2019 Ordinance, the total cost of capital improvements equals $11,961,260 Exhibit P-009.

266.    Exhibit D to the 2019 SAP is entitled "authorized improvement costs." Exhibit P-009.

267.    Exhibit D to the 2019 SAP includes the same chart produced in the Singleton Report, which, for the reasons described above, applied a flawed methodology in calculating the PID developer's reimbursable interest and "total net capital recovery amount." Exhibit P-009; Exhibit P-018.

268.    Defendants contend that the total cost of capital improvements set forth under the 2019 Ordinance does not include any interest.

269.    As required under the PIDA Act, the 2019 Ordinance's service plan includes a five-year budget forecast. Exhibit P-009.

270.    The 2019 Ordinance's five-year budget forecast states that in each FY between 2020 and 2024, the annual "Capital Assessment Installments Due" equals a total of $463,659.56. Exhibit P-009.

271.   When compared to the June 30, 2017 HCLGC internal financial summary and its annual budget for collected capital improvement funds ($280,747), the 2019 Ordinance's budget for annual "Capital Assessment Installments Due" ($463,659.56) represents an increase of $182,912.56. Exhibit P-009; Exhibit P-026.

272.   Under the 2019 Ordinance, the total outstanding capital assessments owed by Carolyn Smith on property ID no. R95408 is $4,180. Exhibit P-009.

273.   Under the 2019 Ordinance, the total outstanding capital assessments owed by LIRTEX on property ID no. R114958 is $316,779.88. Exhibit P-009.

274.   Under the 2019 Ordinance, the total outstanding capital assessments owed by LIRTEX on property ID no. R30102 is $278,116.12. Exhibit P-009.

275.   Together, under the 2019 Ordinance, the total outstanding capital assessments owed by LIRTEX on its properties equals $594,896.00. Exhibit P-009.

276.   Under the 2019 Ordinance, the total outstanding capital assessments owed by VHC on property ID no. R104899 is $793,158.16. Exhibit P-009.

277.   In calculating the outstanding capital assessments per-property under the 2019 Ordinance, the City Defendants did not individually credit each property for the amount of capital assessment payments already made under the assessments rates set forth by the 2003 Ordinance. Exhibit P-029; Exhibit P-030; Exhibit P-031.

278.   Instead, to calculate the outstanding capital assessments per-property under the 2019 Ordinance, the City Defendants' calculation methodology treated all of the purportedly "unpaid" capital balances and payments for each land use category in the aggregate and apportioned the new totals to each property in the PID. Exhibit P-029; Exhibit P-030.

279.   Therefore, the revised capital assessments in the 2019 Ordinance did not account for (i.e. deduct) the payments that Plaintiffs had already made toward their individual property balances as set forth under the 2003 Ordinance. Exhibit P-029; Exhibit P-030.

280.   The 2019 Ordinance states: "An owner of Assessed Property claiming that an error has been made in calculating the Assessment Roll or Annual Installments must send written notice of the alleged error to the Administrator within 30 days after the date the Assessment Roll or Annual Installments were made available for public inspection with the City Secretary." Exhibit P-009.

281.   On October 23, 2019, twenty-nine days after the passage of the 2019 Ordinance, Plaintiffs' attorney Robert Reetz sent a letter of protest on behalf of Plaintiffs to Lynda Humble (then the Bastrop City Manager) and Connie Schroeder (then the Mayor), objecting to the rates and other problems in the 2019 Ordinance. Exhibit P-052.

282.   Plaintiffs' objections to the 2019 Ordinance were never acted upon nor resolved by the City. Exhibit P-053; Exhibit P-054.

283.   After Plaintiffs filed this lawsuit, the City's counsel, George Hyde, responded to Mr. Reetz's letter of protest, stating: "In light of your filed litigation, it appears that your written protest has been voluntarily superseded and abandoned." Exhibit P-054.

## THE 2019 DEVELOPMENT AND REIMBURSEMENT AGREEMENT

284.   Also on September 24, 2019, the City adopted Resolution No. R-2019-86, which ratified the Amended and Restated Development and Reimbursement Agreement executed between the City Defendants and TFHC ("2019 Development and Reimbursement Agreement"). Exhibit P-008; Stipulated Fact 61.

285.   The 2019 Development and Reimbursement Agreement "amends and restates" the 2004 Development and Reimbursement Agreement executed between Sabine/Forestar and the City. Exhibit P-008.

286.   The 2019 Development and Reimbursement Agreement states that it is a "reimbursement agreement" under TEX. LOC. GOV'T CODE § 372.023(d)(1). Exhibit P-008.

287.   The 2019 Development and Reimbursement Agreement states: "the City shall make a payment to the Developer [TFHC] at least annually and no later than 90 days after the date payment of the Assessments for such year are due and payable to the City[.]" Exhibit P-008.

288.   Regarding the amount that TFHC is entitled to receive, the 2019 Development and Reimbursement Agreement states:

-   "The Developer [TFHC] is entitled to a maximum capital reimbursement amount of $11,961,260 pursuant to the SAP." Exhibit P-008.

-   "To date, the Developer has been paid $2,205,097.71 from Assessment Revenue and the Developer is owed $9,756,162.29 (the "Reimbursement Agreement Balance"). Exhibit P-008.

-   "The Reimbursement Agreement Balance is reduced by the 2019 Assessment Roll to an amount equal to $7,376,072.02 which is the amount of all unpaid but levied capital assessments to be collected by the City and paid to the Developer." Exhibit P-008.

289.   The 2019 Development and Reimbursement Agreement also provides that "[r]egardless of any past reference to, or past adoption of, any accrual interest on the principal levy, the allocation of PID payments shall be applied only to the adjusted principal . . . and any and all previously accrued interest shall be waived and cancelled. . . . The total adjusted principal herein shall not bear any interest in the future unless otherwise provided herein." Exhibit P-008.

290.   Although the 2019 Development and Reimbursement Agreement does not explain why the Reimbursement Agreement Balance is reduced from $9,756,162.29 to $7,376,072.02,

Defendants cite to the 2019 Ordinance and explain that this sum "reflects a negotiated additional developer contribution to the PID capital costs."

291.    The capital improvement costs associated with PID improvement projects have all been incurred by TFHC and its predecessor in interest, Sabine/Forestar. Stipulated Fact 62.

292.    The City is responsible for collecting annual PID assessments from PID property owners under the PIDA Act and 2019 Ordinance; however, under the 2019 Development and Reimbursement Agreement, once the City has collected PID assessments from PID property owners, it must subsequently transmit those annual assessment payments to TFHC, as successor-in-interest to the original PID developer. Exhibit P-009; Exhibit P-008.

293.    The 2019 Development and Reimbursement Agreement also discusses the City's obligations to TFHC. It states:

> The obligations of the City under this Agreement shall not, under any circumstances, give rise to or create a charge against the general credit or taxing power of the City or a debt or other obligation of the City payable from any source other than the PID Reimbursement Fund, the PID Pledged Revenue Fund, or the PID Project Fund. Unless approved by the City, no other City funds, revenues, taxes or income of any kind shall be used to pay: (1) the Costs of the Authorized Improvements; (2) the Reimbursement Agreement Balance even if the Reimbursement Agreement Balance is not paid in full; or (3) debt service on any PID Bonds.

Exhibit P-008.

## IV.    CONCLUSIONS OF LAW

1.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs seek (i) a declaration that the 2019 Ordinance is invalid and unenforceable under the due process clause of the United States Constitution; (ii) a declaration that the Individual Defendants acted *ultra vires* by seeking to enforce the 2019 Ordinance; (iii) a declaration that Plaintiffs' property assessments arising under the PIDA Act are limited to and may not be increased from an amount calculated by each property owner's portion of the 2003 assessment of $7,475,734, less any payments that Plaintiffs' has made on their individual parcels and less the proportionate amount that the original developer should have paid in assessments on land it held from 2003 onward; (iv) a permanent injunction restraining the Individual Defendants from implementing or enforcing the 2019 Ordinance; and (v) reasonable and necessary attorneys' fees and costs of court.

2.    Pursuant to TEX. CIV. PRAC. & REM. CODE §§ 37.001 *et seq.*, Plaintiffs seek a declaration that the 2019 Ordinance is invalid and enforceable on the ground that it is an unconstitutional retroactive law under art. I, sec. 16 of the Texas Constitution.

3.    Under Texas state law, Plaintiffs seek judgment against Defendant TFHC for negligent misrepresentation.

4.    In order to resolve Plaintiffs' claims, the Court must begin by interpreting the dispositive legislative materials implicated in this dispute, which are: (i) the PIDA Act; (ii) the 2003 Ordinance; and (iii) the 2019 Ordinance.

**THE PIDA ACT**

5.    To date, no state or federal court has issued a reported opinion interpreting the dispositive provisions of the PIDA Act.

6.    As such, interpreting the PIDA Act to determine the City's obligations in managing and operating the PID is a question of first impression.

7.    The Court concludes that the PIDA Act requires the governing body of a municipality or county to conduct an annual review and update of the service and assessment plan. *See* TEX. LOC. GOV'T CODE § 372.013.

8.    Under the PIDA Act, if the governing body determines that the actual costs of PID improvements has exceeded the prior year's assessments, it must update the service and assessment plan to incorporate those increased costs in that year. *See* TEX. LOC. GOV'T CODE § 372.013.

9.    And if the governing body updates the service and assessment plan to incorporate changes in capital improvement costs occurring that year, the governing body may adjust the PID property owners' capital assessments. *See* TEX. LOC. GOV'T CODE § 372.015(d).

10.   Should the governing body decide not to adjust the assessment in response to that year's actual capital improvement costs, the governing body forfeits its right to adjust the assessment to incorporate that year's overrun improvement costs. *See* TEX. LOC. GOV'T CODE §§ 372.013, 372.015–372.017.

11.   To adjust the assessment, the governing body must comply with the PIDA Act's notice and hearing procedures associated with the assessment roll and levy processes. *See* TEX. LOC. GOV'T CODE §§ 372.016–372.017.

**ANNUAL REVIEW OF THE SERVICE AND ASSESSMENT PLAN**

12.   The PIDA Act does not permit the governing body of a municipality or county to delegate responsibility for the annual review and update of the service and assessment plan to the advisory body or another entity. *See* TEX. LOC. GOV'T CODE § 372.013(a).

13.   Therefore, under the PIDA Act, the City could not delegate to the HCLGC responsibility for the annual review and update of the service and assessment plan.

2028610.v1

14.     The PIDA Act does permit the City to delegate to HCLGC responsibility for preparation of the service and assessment plan. *See* TEX. LOC. GOV'T CODE § 372.013(a).

15.     Yet the PIDA Act makes clear that it is the governing body of the municipality or county, not the "advisory body" or "another entity," that must actually review and approve the service and assessment plan. *See* TEX. LOC. GOV'T CODE § 372.013(a).

16.     This conclusion is also confirmed by the text of the 2003 and 2019 Ordinances. *See* Exhibit P-003 ("The City Council directs that a service and assessment plan be prepared for review and approval by the City Council in accordance with Chapter 372 of the Texas Local Government Code."); Exhibit P-009 (2019 Ordinance) ("The preparation of the SAP may be delegated to an advisory body, but the City Council as the governing body of the municipality is responsible to annually consider the proposed plan").

**THE GOVERNING BODY MUST ADJUST THE ASSESSMENT IN RESPONSE TO AN UPDATED SAP**

17.     In the years that the governing body of a municipality or county updates the service and assessment plan and wants to pass the updated costs on to PID property owners, the PIDA Act requires it to adjust the assessments, propose a new assessment roll, provide notice and hearing on the proposed assessment roll, and, by order or ordinance, levy the new assessments. *See* TEX. LOC. GOV'T CODE §§ 372.015–372.017.

18.     The PIDA Act states that "[t]he amount of assessment for each property owner may be adjusted following the annual review of the service plan." TEX. LOC. GOV'T CODE § 372.015(d).

19.     The PIDA Act commands: "After the total cost of an improvement is determined, the governing body of the municipality or county shall prepare a proposed assessment roll. The roll must state the assessment against each parcel of land in the district[.]" TEX. LOC. GOV'T CODE § 372.016(a).

20.     The PIDA Act outlines specific notice and hearing procedures that the governing body of the municipality or county must comply with in order to put the assessment roll into effect and actually levy the assessments on the PID properties. *See* TEX. LOC. GOV'T CODE §§ 372.016–372.017.

21.     Defendants contend that the PIDA Act does not limit their ability to adjust the assessment to only incorporate overrun capital costs incurred in the year that such an adjustment occurs.

22. Rather, Defendants claim broad discretion to adjust the capital assessment to incorporate overrun capital expenditures incurred at any point during the life of the PID and in the absence of the annual review requirement.

23. Defendants further contend that in order for the City to actually collect adjusted capital assessments, the PIDA Act does not obligate the City to conduct the notice and hearing procedures associated with the assessment roll and levy processes. *See* Tex. Loc. Gov't Code §§ 372.016–372.017.

24. Defendants' reading of the PIDA Act ignores Tex. Loc. Gov't Code § 372.016(a)'s statutory requirement that the City create a proposed assessment roll after the revised total costs of an improvement are determined.

25. In other words, Defendants mistakenly interpret the PIDA Act as only requiring an assessment roll and levy of assessments at the outset of the PID, rather than each time the City adjusts the capital assessments to incorporate newly incurred capital improvement costs.

## THE GOVERNING BODY MAY ONLY ADJUST THE ASSESSMENT TO INCORPORATE THAT YEAR'S OVERRUN CAPITAL COSTS

26. The governing body of a municipality or county may only adjust the assessment to incorporate the prior year's overrun capital improvement costs. Tex. Loc. Gov't Code §§ 372.013, 372.015–372.017.

27. In order to adjust the assessment to incorporate the prior year's overrun capital improvement costs, the governing body must first conduct the annual review of the SAP and approve the updated capital improvement costs. Tex. Loc. Gov't Code §§ 372.013, 372.015–372.017.

28. This conclusion is confirmed by the PIDA Act's requirement that the governing body of the municipality or county annually review and approve the service and assessment plan "for the purpose of determining the annual budget for improvements[,]" as well as the PIDA Act's requirement that a proposed assessment roll can only be prepared after the total cost of improvements are "determined." *See* Tex. Loc. Gov't Code §§ 372.013(b), 372.016(a).

29. If the governing body either fails to conduct the annual review at all, or conducts the annual review but does not update the SAP to incorporate the PID developer's overrun capital costs, the governing body loses the ability to update the SAP and adjust the assessment to incorporate the overrun capital costs from that year into the SAP. Tex. Loc. Gov't Code §§ 372.013, 372.015–372.017.

30. If the governing body of a municipality or county either fails to conduct the annual review at all, or conducts the annual review but does not update the SAP to incorporate the PID developer's overrun capital costs, the PID developer also loses the ability to collect

reimbursements for those specific overrun capital costs. TEX. LOC. GOV'T CODE §§ 372.013, 372.015–372.017.

31. By 2019, the City had no discretion to increase the capital assessments (by adjusting the assessment and levying the adjusted amount) to incorporate overrun costs that were incurred prior to 2018. TEX. LOC. GOV'T CODE §§ 372.013, 372.015–372.017.

## THE GOVERNING BODY HAS NO DISCRETION TO EXEMPT THE PID DEVELOPER FROM PAYING ASSESSMENTS ON ITS PROPERTIES

32. The Court concludes that the PIDA Act does not permit the governing body of a municipality or county to exempt PID developers from paying assessments on properties owned by the PID developer. TEX. LOC. GOV'T CODE § 372.015.

33. Section 372.015 of the PIDA Act limits the City's discretion in determining and apportioning capital assessments. It states:

  (a)   The governing body of the municipality or county shall apportion the cost of an improvement to be assessed against property in an improvement district. The apportionment shall be made on the basis of special benefits accruing to the property because of the improvement.

  (b)   Cost of an improvement may be assessed:

   (1)   equally per front foot or square foot;

   (2)   according to the value of the property as determined by the governing body, with or without regard to improvements on the property; or

   (3)   in any other manner that results in imposing equal shares of the cost on property similarly benefited.

  TEX. LOC. GOV'T CODE § 372.015(a)–(b).

34. Therefore, the PIDA Act plainly commands that apportionment of costs assessed against a PID property "shall be made on the basis of special benefits accruing to the property because of the improvement," and must be made in a manner "that results in imposing equal shares of the cost on property similarly benefited." TEX. LOC. GOV'T CODE § 372.015(a), (b)(3).

35. The PIDA Act briefly discusses "payment by exempt jurisdictions." TEX. LOC. GOV'T CODE § 372.014.

36. That section, however, is inapplicable here, as it relates to "exempt municipal or county property in the district." TEX. LOC. GOV'T CODE § 372.014(b).

37. Defendants do not contend that the original PID developer's properties were "exempt municipal or county property in the district." TEX. LOC. GOV'T CODE § 372.014(b).

38.    As such, the Court concludes that the PIDA Act does not permit the governing body of a municipality or county to exempt a PID developer from paying capital assessments on the developer's properties within the PID. TEX. LOC. GOV'T CODE § 372.015.

39.    Here, the Court finds that the City violated the PIDA Act because it exempted the original developer (Sabine/Forestar) from paying assessments on it numerous properties prior to transferring them to third-party buyers.

**THE PIDA ACT'S LIMITATIONS ON INTEREST**

40.    The PIDA Act authorizes a governing body to include two types of interest in the capital assessments: (i) interest on annual installments of assessment payments; and (ii) capitalized interest that arises under specified types of financial instruments.

41.    With respect to interest on annual assessment payments, "[t]he governing body may provide that assessments be paid in periodic installments, at an interest rate and for a period approved by the governing body." TEX. LOC. GOV'T CODE § 372.017(b).

42.    Defendants have judicially admitted that "to date, the City has not collected interest on the PID assessment." Exhibit P-066.

43.    Furthermore, under the 2019 Development and Reimbursement Agreement, TFHC waived its right to collect any past or future interest on PID assessments. Exhibit P-056.

44.    The PIDA Act also permits the governing body to include capitalized interest as a cost of the capital assessments, but only when the developer is owed interest on a particular type of financial instrument.

45.    In relevant part, the PIDA Act states: "The costs of any improvement include interest payable on a temporary note or time warrant[.]" TEX. LOC. GOV'T CODE § 372.023(h).

46.    Therefore, unless a PID developer is owed interest under a temporary note or time warrant, the PIDA Act does not permit the governing body to include interest as a cost of an improvement in the capital assessments. TEX. LOC. GOV'T CODE § 372.023(h).

47.    This means that, unless a PID developer is owed interest under a temporary note or time warrant, the PIDA Act does not permit the governing body to reimburse the developer for capitalized interest costs claimed by the developer.

48.    Nowhere in the PIDA Act does the Texas Legislature state that the costs of any improvement include interest payable on a reimbursement agreement.

49.    During the life of the PID, no general obligation bonds, revenue bonds, time warrants, or temporary notes have ever been issued by the City to finance the developer's construction of capital improvements.

50.    During the life of the PID, the PID developer's right to capital assessment reimbursements was established under a reimbursement agreement – first, the original 2004 Development

and Reimbursement executed between Sabine/Forestar and the City, and subsequently the 2019 Development and Reimbursement Agreement executed between TFHC and the City.

51.    The 2004 Development and Reimbursement Agreement provided that "[t]he outstanding amounts due to Developer pursuant to this Agreement shall bear interest on the unpaid principal amount thereof outstanding from time to time at the Prime Rate plus two percent per annum. Interest will accrue from the date of each borrowing to pay Project Costs." Exhibit P-005.

52.    For a governing body to include capitalized interest as a component of the capital assessments levied against PID properties, the governing body must issue either a temporary note or time warrant that includes payable interest. TEX. LOC. GOV'T CODE § 372.023(h).

53.    Here, because the City never issued a temporary note or time warrant to the PID developer to pay for the costs of capital improvements, the City was not authorized to include interest as a cost in the capital assessments that were levied against PID property owners.

54.    Moreover, even assuming that the PIDA Act did permit interest incurred under the 2004 Development and Reimbursement Agreement to be included in the capital assessments, it is undisputed that during the life of the PID, the PID developer never borrowed money to pay for the construction of capital improvements, and therefore never incurred any actual interest paid on a debt.

55.    This is consistent with George Hyde's conclusion that the Hunters Crossing PID "is a zero interest PID." Exhibit P-049.

56.    In making this conclusion, Mr. Hyde noted that because "there has been no borrowing, the PID costs have not been subject to interest at all and are not subject to interest until and unless there is a 'borrowing' . . . to pay" for capital improvements. Exhibit P-049.

**THE 2003 ORDINANCE**

57.    Plaintiffs interpret the 2003 Ordinance as having levied $7.475 million in capital assessments against the individual parcels comprising the PID.

58.    In contrast, Defendants interpret the 2003 Ordinance as having levied $11.961 million in capital assessments against a single 283-acre parcel comprising the entire PID.

59.    The Court concludes that the 2003 Ordinance levied $7.475 million in capital assessments against the individual parcels comprising the PID.

60.    This conclusion is confirmed by the plain text of the 2003 Ordinance, the PIDA Act, and the City's actions following the enactment of the 2003 Ordinance.

61.    In describing the capital assessments, the 2003 Ordinance identified $7.475 million in estimated capital expenditures, and $4.5 million in estimated interest calculated using a 6%

simple interest rate applied over a 10-year period, for a total of $11.961 million. Exhibit P-003.

62.   However, Defendants admit that (i) the City never collected any interest on PID assessments; (ii) "[i]nterest does not make up a single dime of the 2003 assessment"; (iii) "every penny of the 2003 assessment . . . is made up of hard construction costs"; and (iv) "interest could not have made up any portion of the 2003 assessment." Exhibit P-066; Dkt. 94 at ¶ 16.

63.   Pursuant to the City-TFHC 2019 Development and Reimbursement Agreement, TFHC waived any past or future right to collect interest in PID assessments. Exhibit P-056.

64.   The architect of the 2019 Ordinance, George Hyde, concluded that the deficiencies in the 2003 Ordinance rendered the Hunters Crossing PID "a zero interest PID." Exhibit P-049.

65.   Defendants fail to explain how the City could have been collecting capital assessment payments between 2003 and 2019 without interest if the total capital assessment amount included in the 2003 Ordinance explicitly included $4.5 million in interest.

66.   It is undisputed that the 2003 capital assessments did not include interest.

67.   It is also undisputed that, pursuant to the 2019 Development and Reimbursement Agreement, TFHC waived its right to collect any interest under the 2003 Ordinance.

68.   As noted above, the Court has also found that until the enactment of the 2019 Ordinance, the City never adjusted the capital assessments to incorporate the developer's overrun capital improvement costs.

69.   Taken together, the Court concludes that the 2003 Ordinance provided for $7.475 million in capital assessments.

## THE 2003 ORDINANCE DID NOT AND COULD NOT LEVY CAPITAL ASSESSMENTS IN LUMP SUM AGAINST A SINGLE PARCEL

70.   Next, the Court finds that the 2003 Ordinance did not levy a lump-sum assessment against the entire 283 acres comprising the PID.

71.   Nowhere in the 2003 Ordinance does it state that the capital assessments are levied against a single tract.

72.   In contrast, the 2003 Ordinance states that the capital assessments are levied against distinct parcels in the PID.

73.   For example, the 2003 Ordinance states: "The City Council finds that the assessments . . . should be made and levied *against the respective parcels of property* within the PID and against the *owners* thereof, and are substantially in proportion to the benefits of the *respective parcels* of property by means of improvements in the PID for which such assessments are levied, and establish substantial justice and equality and uniformity between *respective owners of the respective properties* and between all parties concerned

considering the benefits received and burdens imposes, and further finds that ***in each case the property assessed*** is specifically benefited by means of the said improvements in the PID[.]" Exhibit P-003 (emphasis added).

74.   The 2003 Ordinance also states: "There shall be and is hereby levied and assessed against the ***parcels*** of property within the PID, and against the ***owners*** thereof (whether such owners be correctly names or not), the sums of money set forth in the Assessment/Service Plan[.]" Exhibit P-003 (emphasis added).

75.   Moreover, the Service and Assessment Plan attached to the 2003 Ordinance makes numerous references to and descriptions of the multiple tracts comprising the PID, and uses these tracts to calculate the assessments that were levied on a parcel-by-parcel basis. Exhibit P-003.

76.   "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Kaltenbach v. Richards,* 464 F.3d 524, 528 (5th Cir. 2006) (quoting *TRW Inc. v. Andrews,* 534 U.S. 19, 21 (2001)).

77.   Defendants' interpretation would render numerous clauses of the 2003 Ordinance as superfluous and void, and as a result, cannot pass muster.

78.   The Court's conclusion that the 2003 Ordinance did not levy capital assessments against a single 283-acre tract is also confirmed by the PIDA Act, which refers to assessments as individualized to property owners and particular tracts. *See* Tex. Loc. Gov't Code § 372.015 ("The amount of assessment for each property owner may be adjusted following the annual review of the service plan); *id.* § 372.016(a) ("The [assessment] roll must state the assessment against each parcel of land in the district, as determined by the method of assessment chosen by the municipality or county"); *id.* § 372.017(a) ("At or on the adjournment of the hearing referred to by Section 372.016 on proposed assessments . . . [t]he governing body may amend a proposed assessment on any parcel.").

79.   In contrast to Defendants' position, the PIDA Act does not permit a municipality to assess and levy improvement costs against a single tract comprising the entire PID.

80.   Defendants' theory that the 2003 Ordinance levied $11.961 million in bulk on a single 283-acre tract comprising the entire PID is refuted by the City's actions following the enactment of the 2003 Ordinance.

81.   After the 2003 Ordinance was passed, the Bastrop County Tax Assessor collected PID assessments by property ID. Exhibit P-034.

82.   Prior to 2019, despite collecting PID assessments by property ID, the Bastrop County Tax Assessor did not maintain reports of assessments paid by parcel. The information was always available to Defendants; it was merely disorganized and needed to be collated.

83.   In June 2017, Tracy Waldron represented that she was able to "calculate what the assessment would be on any parcel." Exhibit P-036.

84.   In March 2018, Misty Ventura calculated the total capital assessment levied under the 2003 Ordinance on the multifamily parcel owned by MacDonald, PID property ID no. R113268. Exhibit P-038.

85.   Also in March 2018, Misty Ventura calculated the total capital assessment levied under the 2003 Ordinance on the property owned by VHC, PID property ID no. R104899. Exhibit P-045.

86.   Taken together, the Court concludes that under the 2003 Ordinance, capital assessments were levied against the distinct parcels within the PID, rather than levied lump-sum against a single 283-acre parcel comprising the entire PID.


**PLAINTIFFS' CAPITAL ASSESSMENTS UNDER THE 2003 ORDINANCE**

87.   Under the 2003 Ordinance, the total aggregate assessment encumbering Plaintiff Carolyn Smith's property was $6,192. Exhibit P-003; Exhibit P-030.

88.   Under the 2003 Ordinance (as amended by the 2004 Ordinance), the total aggregate assessment encumbering Plaintiff LIRTEX's property was $437,820. Exhibit P-003; Exhibit P-030.

89.   Under the 2003 Ordinance (as amended by the 2004 Ordinance), the total aggregate assessment encumbering Plaintiff VHC's property was $246,836. Exhibit P-003; Exhibit P-030.

**IN VIOLATION OF THE PIDA ACT, THE 2003 ORDINANCE EXEMPTED THE PID DEVELOPER FROM PAYING ASSESSMENTS ON ITS PROPERTIES**

90.   The Court concludes that the 2003 Ordinance was defective because it exempted the original developer from paying capital assessments on the PID properties that it owned. *See* TEX. LOC. GOV'T CODE § 372.015.

91.   The 2003 Ordinance provided that "[t]he first annual PID assessments on commercial and multifamily property located in the PID shall be due on the last to occur of the following two events: (a) the effective date of this Ordinance; or (b) the date that ownership of the

tract or lot of land located in the PID is transferred from [the original developer] Sabine Investments, Inc. The first annual assessments on single-family property located in the PID shall be due on the date that the property is transferred to the homeowner." Exhibit P-003.

92.     Because the 2003 Ordinance delayed the obligation to pay PID assessments until the original developer transferred a particular property, the 2003 Ordinance failed to apportion costs assessed against PID properties "on the basis of special benefits accruing to the property because of the improvement[.]" TEX. LOC. GOV'T CODE § 372.015(a).

93.     Despite the fact that the original developer's properties were specially benefited by the improvements prior to being transferred to third-party purchasers, the 2003 Ordinance erroneously relieved the original developer from paying its share of the capital assessments.

94.     Because the original developer was unlawfully exempted from paying capital assessments under the 2003 Ordinance, the other PID property owners' capital assessments were proportionally larger than they should have been from 2003 onward.

95.     In contravention of TEX. LOC. GOV'T CODE § 372.015(a), this infirmity resulted in unequal costs imposed on all properties not owned by the original developer, resulting in the 2003 Ordinance's failure to apportion costs assessed against PID properties "on the basis of special benefits accruing to the property because of the improvement[.]" TEX. LOC. GOV'T CODE § 372.015(a).

## THE 2019 ORDINANCE

96.     Plaintiffs and Defendants both agree that the 2019 Ordinance provided for $11.961 million in total capital assessments.

97.     Yet because the parties disagree as to amount of capital assessments under the 2003 Ordinance, they necessarily disagree on the effect of the 2019 Ordinance.

98.     Having concluded that the 2003 Ordinance levied a total of $7.475 million in capital assessments against the individual parcels in the PID, the Court finds that the 2019 Ordinance raises the original 2003 assessments to $11.961 million.

99.     Between 2005 and 2016, the City Council failed to conduct an annual review of the 2003 SAP in accordance with the PIDA Act.

100.    Between 2005 and 2012, neither the City Council nor HCLGC conducted an annual review.

101.    In each of the years between 2012 and 2016, the HCLGC reviewed and approved the 2003 capital improvement costs without revision. Exhibit P-010; Exhibit P-011; Exhibit P-012; Exhibit P-013; Exhibit P-014; Exhibit P-015.

102.    Although the City Council conducted an annual review of the 2003 SAP in 2017 and 2018, it did not update the capital improvement costs in the 2003 SAP, despite its knowledge that

the original developer had incurred overrun capital improvement costs far exceeding the 2003 SAP's estimate.

103.   Because the City Council failed to conduct annual reviews of the 2003 SAP in the years that the original developer incurred overrun capital improvement costs, it was prohibited from incorporating those overrun costs into the capital assessments in later years. *See* TEX. LOC. GOV'T CODE §§ 372.013, 372.015–372.017.

104.   The increased sum of capital assessments under the 2019 Ordinance is comprised of overrun capital improvement expenditures incurred by the original developer prior to 2011.

105.   Taken together, by enacting the 2019 Ordinance, the City Defendants exceeded their statutory authority under the PIDA Act because the 2019 Ordinances raises the capital assessments by incorporating the original developer's overrun capital improvement costs no fewer than seven years after those costs were incurred. *See* TEX. LOC. GOV'T CODE §§ 372.013, 372.015–372.017.

106.   Because the City has never incurred any costs associated with PID capital improvements, the increased capital assessments under the 2019 Ordinance do not offset any costs borne by the City.

107.   Rather, the increased capital assessments under the 2019 Ordinance offset the overrun capital improvement costs borne by TFHC, through its predecessor in interest Sabine/Forestar.

108.   Even assuming that the City had properly conducted the required annual reviews in the years that the original developer incurred overrun capital improvement costs, and updated the capital assessments accordingly, the 2019 Ordinance was enacted in the absence of the PIDA Act's mandatory notice and hearing procedures. *See* TEX. LOC. GOV'T CODE §§ 372.016–.017.

109.   The 2019 Ordinance impermissibly revised the 2003 capital assessments both by increasing them and re-apportioning them among the parcels in the PID.

110.   In contrast to Defendants' position, the 2019 Ordinance did not simply update the 2003 SAP.

111.   Because the 2019 Ordinance put into effect a revised assessment roll that increased capital assessments and reapportioned them among the distinct parcels in the PID, the 2019 Ordinance constituted a levy of the adjusted capital assessments under the revised assessment roll. *See* TEX. LOC. GOV'T CODE §§ 372.016–.017.

112.   Because the 2019 Ordinance had the effect of levying the adjusted capital assessments under the revised assessment roll, the City was required to comply with the notice and hearing procedures of TEX. LOC. GOV'T CODE §§ 372.016–.017.

113.   In violation of the PIDA Act, the City Defendants failed to conduct the PIDA Act's required notice and hearing procedures for updating the assessment roll and levying the revised capital assessments. *See* TEX. LOC. GOV'T CODE §§ 372.016–.017.

## THE 2019 ORDINANCE DID NOT INDIVIDUALLY CREDIT PLAINTIFFS FOR THEIR PAST ANNUAL ASSESSMENT PAYMENTS

114.   The Court finds that the 2019 Ordinance did not credit Plaintiffs for their past annual assessment payments made on their individual parcels.

115.   In calculating the outstanding assessments per property ID number under the 2019 Ordinance, the City did not credit each property owner for the amount of payments each made toward the original 2003 SAP.

116.   Instead, the City's calculation methodology treated all unpaid capital balances and payments in the aggregate to arrive at the per land use assessments.

117.   Then, the City's calculation methodology apportioned the revised per land use assessments to each owner.

118.   The result of the City's failure to individually credit multifamily PID property owners for assessments already paid was to reassess the total capital costs at a higher rate without consideration for amounts already paid.

119.   The result of the City's failure to individually credit commercial PID property owners for assessments already paid was to restate the total capital assessments on all commercial properties at a slightly lower rate per square foot.

## THE EFFECT OF THE 2019 ORDINANCE ON PLAINTIFFS

120.   As noted above, the Court finds that the 2019 Ordinance did not individually credit Plaintiffs for the past annual assessment payments they made on their respective parcels.

121.   Under the 2019 Ordinance, the total outstanding capital assessment encumbering Carolyn Smith's property is $4,180. Exhibit P-009.

122.   Until the 2019 Ordinance was enacted, Carolyn Smith had paid a total of $3,804 in annual capital assessments. Exhibit P-029.

123.   Because the 2019 Ordinance failed to credit Carolyn Smith for the $3,804 in annual capital assessments already paid, the 2019 Ordinance increases her capital assessments by $1,792.00. Exhibit P-029.

124.   Under the 2019 Ordinance, the total outstanding capital assessment encumbering LIRTEX's property ID no. R30102 is $278,116.12. Exhibit P-009.

125.   Under the 2019 Ordinance, the total outstanding capital assessment encumbering LIRTEX's property ID no. R114958 is $316,779.88. Exhibit P-009.

126.   Under the 2019 Ordinance, the combined total outstanding capital assessments encumbering LIRTEX's properties in the PID equals $594,896.00. Exhibit P-009.

127.   Until the 2019 Ordinance was enacted, the LIRTEX properties had paid a total of $559,121 in annual capital assessments. Exhibit P-029.

128.   Because the 2019 Ordinance failed to credit LIRTEX for the $559,121 in annual capital assessments already paid, the 2019 Ordinance increases its capital assessments by at least $716,197. Exhibit P-029.

129.   Under the 2019 Ordinance, the total outstanding assessment encumbering VHC's property ID no. R104899 is $793,158.16. Exhibit P-009.

130.   Until the 2019 Ordinance was enacted, VHC had paid a total of $115,067 in annual capital assessments. Exhibit P-029.

131.   Because the 2019 Ordinance failed to credit VHC for the $115,067 in annual capital assessments already paid, the 2019 Ordinance increases its capital assessments by at least $661,389. Exhibit P-029.

## COUNTS I, II, and III

132.   Under Count I, Plaintiffs seek a declaration that the 2019 Ordinance is invalid and unenforceable under the United States Constitution, Texas Constitution and state law.

133.   Under Count II, Plaintiffs seek a declaration that (i) the Individual Defendants acted *ultra vires* by attempting to enforce the 2019 Ordinance; and (ii) Plaintiffs' property assessments arising under the PIDA Act are limited to and may not be increased from an amount calculated by each property owner's portion of the 2003 assessment of $7,475,734, less any payments that Plaintiffs' has made on their individual parcels and less the proportionate amount that the original developer should have paid in assessments on land it held from 2003 onward.

134.   Under Count III, Plaintiffs seek a permanent injunction restraining the Individual Defendants from implementing or enforcing the 2019 Ordinance.

135.   Because each of these Counts relate to the validity of the 2019 Ordinance under the United States and Texas Constitutions, the Court will analyze them together.

## SECTION 1983 CLAIMS

136.   Pursuant to 42 U.S.C. § 1983, Plaintiffs allege that the City's enactment of the 2019 Ordinance deprived them of their substantive and procedural due process rights.

137.   Plaintiffs seek a declaration that the 2019 Ordinance's constitutional infirmities render it invalid and unenforceable, a declaration that the Individual Defendants acted *ultra vires* in

seeking to enforce the 2019 Ordinance, and a permanent injunction preventing the Individual Defendants from enforcing the 2019 Ordinance in the future

138.   Section 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitutions and laws of the Unites States." 42 U.S.C. § 1983.

139.   Section 1983 provides a federal remedy for violations, under color of state law, of the rights secured by the Constitution, including the right to due process guaranteed by the Fourteenth Amendment. *Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471, 481 (5th Cir. 2006).

## SUBSTANTIVE DUE PROCESS AND THE 2019 ORDINANCE

140.   The Due Process Clause protects against "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

141.   Unlike procedural due process which requires certain procedures be in place when the government deprives a person of a protected liberty, substantive due process is implicated by the act itself of depriving someone of a protected right without any reasonable justification in terms of a legitimate governmental objective. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

142.   To establish a substantive due process violation, Plaintiffs must prove that: (i) the City Defendants deprived Plaintiffs of a constitutionally protected property interest; and (ii) this deprivation was arbitrary, unreasonable, or had no relationship to a legitimate government interest. *See Simi Investment Company, Inc. v. Harris County, Texas*, 236 F.3d 240, 249 (5th Cir. 2000); *see also Hidden Oaks v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1996) ("In order to assert a violation of this amendment, one must at least demonstrate the deprivation of a protected property interest established through some independent source such as state law.") (internal quotation marks and citations omitted).

## CONSTITUTIONALY PROTECTED PROPERTY INTERESTS

143.   To succeed on their substantive due process claim, Plaintiffs first must establish that they held a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies. *Simi Investment Company, Inc. v. Harris County, Texas*, 236 F.3d 240, 249–50 (5th Cir. 2000).

144.   The nature of Plaintiffs' property interest here must be determined by Texas law. *See Hidden Oaks v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1996) ("Under this analysis, the hallmark . . . is an individual entitlement grounded in state law, which cannot be removed except for cause") (internal quotations marks and citations omitted); *see also Woodard v. Andrus,* 419 F.3d 348, 354 (5th Cir. 2005) ("state-created property rights are protected by due process of law"); *Blackburn v. City of Marshall*, 42 F.3d 925, 936–37 (5th Cir. 1995) ("Property interests are not created by the Constitution; rather, they stem from

independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings.").

145.   A property interest arises where an individual has a "legitimate claim to entitlement" in some right. *Skidmore v. Shamrock Indep. Sch Dist.,* 464 F.2d 605, 606 (5th Cir. 1972); *see also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982) (quoting *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 11–12 (1978)) ("The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'").

146.   "[T]he types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982) (quoting *National Mutual Insurance Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting)).

147.   A statute or regulation creates a property interest for individuals when it places substantial limits on the government's exercise of its discretion. *See Ridgley v. Fed. Emergency Mgmt. Agency,* 512 F.3d 727, 735 (5th Cir. 2008) ("In determining whether statutes and regulations limit official discretion, the Supreme Court has explained that we are to look for explicitly mandatory language, *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow").

148.   A legislature's use of mandatory language in a statute generally indicates a substantive limit on a government official's exercise of discretion. *See Ridgley v. Fed. Emergency Mgmt. Agency,* 512 F.3d 727, 735–36 (5th Cir. 2008); *see also Hampton Co. Nat'l Sur. LLC v. Tunica County Miss.,* 543 F.3d 221, 226 (5th Cir. 2008) ("No discretion in the official and a reasonable expectation in the citizen are central elements of a protected property interest."); *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756 (2005) ("a benefit is not a protected entitlement if governments officials may grant or deny it in their discretion.").

149.   A number of the dispositive PIDA Act provisions at issue use mandatory language, including:
   • "The advisory body *shall* prepare an ongoing service plan and present the plan to the governing body of the municipality or county for review and approval . . . The plan *must* cover a period of at least five years and *must* also define the annual indebtedness and the projected costs for improvements. The plan *shall* be reviewed and updated annually for the purpose of determining the annual budget for improvements." TEX. LOC. GOV'T CODE § 372.013 (emphasis added).
   • "An assessment plan *must* be included in the annual service plan." TEX. LOC. GOV'T CODE § 372.014 (emphasis added).
   • "The governing body of the municipality or county *shall* apportion the cost of an improvement to be assessed against property in an improvement district. The

apportionment *shall* be made on the basis of special benefits accruing to the property because of the improvement." TEX. LOC. GOV'T CODE § 372.015(a) (emphasis added).

- "After the total cost of an assessment is determined, the governing body of the municipality or county *shall* prepare a proposed assessment roll. The roll *must* state the assessment against each parcel of land in the district, as determined by the method of assessment chosen by the municipality or county under this subchapter." TEX. LOC. GOV'T CODE § 372.016(a) (emphasis added).

- "At or on the adjournment of the hearing referred to by Section 372.016 on proposed assessments, the governing body of the municipality or county *must* hear and pass on any objection to a proposed assessment." TEX. LOC. GOV'T CODE § 372.017(a) (emphasis added).

- "After all objections have been heard and the governing body has passed on the objections, the governing body by ordinance or order *shall* levy the assessment as a special assessment on the property. The governing body by ordinance or order *shall* specify the method of payment of the assessment." TEX. LOC. GOV'T CODE § 372.017(b) (emphasis added).

- "If general obligation bonds, revenue bonds, time warrants, or temporary notes are issued to finance the improvement for which the assessment is assessed, the interest rate for that assessment *may not exceed* a rate that is one-half of one percent higher than the actual interest rate paid on the debt." TEX. LOC. GOV'T CODE § 372.018(a) (emphasis added).

- "The interest rate on unpaid amounts due under a[] . . . reimbursement agreement . . . (1) *may not exceed*, for a period of not more than five years, as determined by the governing body of the municipality or county, five percent above the highest average index rate for tax-exempt bonds reported in a daily or weekly bond index approved by the governing body and reported in the month before the date the obligation was incurred; and (2) after the period described in Subdivision (1), *may not exceed* two percent above the bond index rate described in Subdivision (1)." TEX. LOC. GOV'T CODE § 372.023(e) (emphasis added).

150. Because the PIDA Act places significant restrictions on the City' discretion in adjusting assessments by mandating the process required for adjustment, Plaintiffs have shown that the PIDA Act provides them with constitutionally protected property rights. *See Ridgley v. Fed. Emergency Mgmt. Agency,* 512 F.3d 727, 735–36 (5th Cir. 2008); TEX. LOC. GOV'T CODE §§ 372.013–372.018, 372.023.

151. Relevant to the case at bar, Plaintiffs have shown that they are entitled to the following constitutionally protected property interests arising under the PIDA Act:

- A property interest in having their real property subject to PID assessments lawfully apportioned and levied under the PIDA Act's statutory commands. *See* TEX. LOC. GOV'T CODE §§ 372.013, 372.015–372.017.

- A property interest in retaining credit from their previous annual payments of PID assessments under the revised 2019 assessments. *See* TEX. LOC. GOV'T CODE § 372.015.
- A property interest in having their properties assessed on the basis of special benefits accruing to their property because of the capital improvement and in a manner that imposes equal costs among those similarly benefited. *See* Tex. LOC. GOV'T CODE § 372.015.
- A property interest in not paying interest that is impermissible under the PIDA Act as set forth in TEX. LOC. GOV'T CODE § 372.018(a).

152. Plaintiffs have shown that the 2019 Ordinance deprived them of their constitutionally protected property interests arising under the PIDA Act.

153. In the absence of statutory compliance, the City Defendants increased Plaintiffs' individual capital assessments.

154. The 2019 Ordinance increases Plaintiff Carolyn Smith's total capital assessment obligation by at least $1,792.

155. The 2019 Ordinance increases Plaintiff LIRTEX's total capital assessment obligation by at least $716,197.

156. The 2019 Ordinance increases Plaintiff VHC's total capital assessment obligation by at least $661,389.

157. The City Defendants adjusted Plaintiffs' capital assessments despite the fact that the City Council failed to conduct the PIDA Act's mandatory annual review procedures in the years that the developer incurred overrun capital improvement costs. *See* TEX. LOC. GOV'T CODE § 372.013.

158. Under the PIDA Act's statutory structure, the City's failure to conduct annual reviews in the years that the original developer incurred overrun improvement costs meant that the City could not, in subsequent years, incorporate the developer's overrun costs into Plaintiffs' remaining capital assessments. *See* TEX. LOC. GOV'T CODE § 372.013.

159. In calculating Plaintiffs' capital assessments under the 2019 Ordinance, the City did not individually credit Plaintiffs for their past annual capital assessment payments to the City.

160. Each commercial property was assessed the same amount in the 2019 Ordinance regardless of the amount of past-annual capital assessments made.

161. The City failed to individually credit single-family property owners for past assessment payments.

162.   The City credited the aggregate of all single-family capital assessment payments made prior to the enactment of the 2019 Ordinance and then allocated the outstanding balance across each single-family parcel.

163.   Through the 2019 Ordinance, the City failed to individually credit Plaintiff Carolyn Smith for $3,804 in past capital assessment payments.

164.   Through the 2019 Ordinance, the City failed to individually credit Plaintiff LIRTEX for $559,121 in past capital assessment payments.

165.   Through the 2019 Ordinance, the City failed to individually credit Plaintiff VHC for $115,067 in past capital assessment payments.

166.   In calculating the capital assessments under the 2019 Ordinance, the City's failure to individually credit Plaintiffs for past capital assessment payments had the result of increasing the assessment liens on Plaintiffs' properties.

167.   The 2019 Ordinance calculated Plaintiffs' outstanding capital assessments under the flawed 2003 Ordinance, which impermissibly exempted the original developer from paying capital assessments on its properties until the particular property was transferred to Plaintiffs.

168.   This further contributed to Plaintiffs' increased capital assessments under the 2019 Ordinance in that the City failed to apportion the costs of capital improvements "on the basis of special benefits accruing to the property because of the improvement" and in a manner that imposed "equal shares of the cost on property similarly benefited." TEX. LOC. GOV'T CODE § 372.015(a), (b)(3).

## RATIONAL BASIS REVIEW

169.   Satisfied that the 2019 Ordinance deprives Plaintiffs' protected property interests arising under the PIDA Act, the Court must consider whether this deprivation is rationally related to a legitimate government interest.

170.   "The legal inquiry using the rational basis test is two-fold. The Court must determine (1) whether the regulation has a legitimate governmental purpose; and (2) whether there is a rational relationship between that purpose and the means chosen by the State to accomplish it." *St. Joseph Abbey v. Castille,* 835 F. Supp. 2d 149, 156 (E.D. La. 2011), *aff'd by*, 712 F.3d 215 (5th Cir. 2013).

171.   "The requirement of a legitimate public purpose guarantees that the [governmental body] is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group v. Kan. Power & Light Co.,* 459 U.S. 400, 412 (1983).

172.  When government action is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare," it is not rationally related to a legitimate government interest and may be held to violate due process. *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174–75 (5th Cir. 1996) (quoting *Euclid v. Amber Realty Co.,* 272 U.S. 365, 395 (1926)).

173.  In a rational-basis review of substantive due process claims, the inquiry focuses on whether "the governmental body *could* have had no legitimate reason for its decision." *Shelton v. City of College Station,* 780 F.2d 475, 483 (5th Cir. 1983) (en banc) (citing *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464 (1985)).

174.  "[A]lthough rational basis review places no affirmative evidentiary burden on the government, [a] plaintiff[] may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

175.  In the Fifth Circuit, rational basis analysis "does not proceed with abstraction for hypothesized ends and means do not include post hoc hypothesized facts." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

176.  Rational basis review of economic regulation "does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013).

177.  "While the 'rational basis' standard is the least demanding test used by the courts to uphold governmental action, it is not 'toothless.'" *Simi Inv. Co. v. Harris County,* 236 F.3d 240, 253 (5th Cir. 2000) (quoting *Berger v. City of Mayfield Heights*, 154 F.3d 621, 625 (6th Cir. 1998)).

178.  Even under this low threshold, the City has failed to show that a rational basis exists to justify its interference with Plaintiffs' protected property rights.

179.  The Court cannot conceive a legitimate basis upon which the City choose not to follow the mandatory provisions of the PIDA Act for over 15 years to the detriment of property owners and then pass an ordinance that increased Plaintiffs' capital assessments for the benefit of a developer.

180.  As discussed above, the 2003 SAP could not be revised in 2019 to incorporate the original developer's long-since-incurred overrun capital improvement expenditures because the City failed to conduct the PIDA Act's mandatory annual review of the 2003 SAP in the years that the original developer incurred those overrun capital improvement costs.

181. The City's failure to comply with the PIDA Act meant that by 2018, when TFHC purchased its interest in the PID, TFHC could not obtain reimbursement for the overrun capital expenditures incurred by its predecessor-in-interest, Sabine/Forestar.

182. Increasing Plaintiffs' assessments in the absence of statutory compliance in order to reimburse TFHC cannot reasonably relate to a legitimate government objective, even under the broad standards of the City's police power – no public welfare was served by the City Defendants' failure to fulfill their PIDA Act obligations, nor by their methods of solving the problems that arose from such neglect.

183. Measured against the rational basis test, the 2019 Ordinance's effect of increasing the original PID assessment in the absence of statutory compliance is clearly arbitrary, capricious, and violative of due process.

184. To be sure, a governmental body has a legitimate interest in charging fees to offset its costs. *See Broussard v. Parish of New Orleans,* 318 F.3d 644, 656–57, 660 (5th Cir. 2003), *cert. denied,* 539 U.S. 915 (2003).

185. Critically here, the City is not indebted to TFHC. In accordance with the PIDA Act and 2019 Development and Reimbursement Agreement, all of the capital assessments collected by the City are paid to TFHC, as successor-in-interest to the original PID developer.

186. Accordingly, the City's act of increasing the capital assessments on Plaintiffs' properties does not offset its own costs.

187. Rather, the City's act of increasing the capital assessments on Plaintiffs' properties operates to offset the overrun capital improvement costs borne by TFHC, through its predecessor-in-interest Sabine/Forestar.

188. The City's only obligation is to collect PID assessments from PID property owners as provided in the 2003 Ordinance and reimburse TFHC those amounts.

189. If the 2019 Ordinance is invalidated, the City bears no financial loss. Therefore, the City Defendants cannot point to a legitimate interest in offsetting costs.

190. The only basis in the record to explain the City's act of increasing the original PID assessments in the absence of statutory compliance appears to be the ensuing benefit to the PID developer, TFHC, by enlarging the aggregate assessments for which TFHC could be reimbursed.

191. The record strongly suggests that the City implemented an illegitimate plan to benefit the private interests of Defendant TFHC, who was financially benefitted by the increased

assessments under the 2019 Ordinance. *See Simi Inv. Co. v. Harris County,* 236 F.3d 240, 254 (5th Cir. 2000) ("That the County acted to benefit solely private interests does not necessarily demonstrate a substantive due process violation. . . . However, the County failed to put forth any alternative rational basis for the continued interference with property rights. . . . [W]ithout a rational basis . . . the County's arguments fail to survive even a rational basis review.").

192.     Consequently, the Court concludes that the 2019 Ordinance deprives Plaintiffs of their constitutionally protected property interests without a rational basis and, as such, denies Plaintiffs due process under the United States Constitution.

**PROCEDURAL DUE PROCESS AND THE 2019 ORDINANCE**

193.     In order to establish a violation of their procedural due process rights, Plaintiffs must show that (i) they have a constitutionally protected property interest in having their real property subject to PID assessments lawfully apportioned and levied under the PIDA Act's statutory commands; and (ii) the City Defendants deprived them of that interest without due process of law. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

194.     In contrast to substantive due process, procedural due process requires the government to follow appropriate procedures when its agents decide to "deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986).

195.     The core requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

196.     The Supreme Court has emphasized that procedural due process has two related but distinct goals:

> The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property. . . . For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented.

*Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972).

197.     The "right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane v. Central Hanover Bank & Trust Co.* 339 U.S. 306, 314 (1950).

198.     Due process requires "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

199. "The notice must be of such a nature as reasonably to convey the required information and it must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

200. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane v. Central Hanover Bank & Trust Co.* 339 U.S. 306, 315 (1950).

201. "Procedural due process is a flexible concept whose contours are shaped by the nature of the individual's and the state interests in a particular deprivation." *Caine v. Hardy*, 943 F.2d 1406, 1412–13 (5th Cir. 1991) (en banc).

202. Courts weigh several factors in deciding exactly how much process is due: (i) the private interest that will be affected by the official action; (ii) the risk of erroneous deprivation; (iii) the probable value, if any, of additional or substitute procedural safeguards; and (iv) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

203. As noted above, Plaintiffs have satisfied the first prong of their procedural due process claim by establishing constitutionally protected property interests arising under the PIDA Act.

204. Specific to their procedural due process claim, Plaintiffs have established a constitutionally protected property interest in having their real property subject to PID assessments lawfully apportioned and levied under the PIDA Act's statutory commands. *See* Tex. Loc. Gov't Code §§ 372.013, 372.015–372.017.

205. As discussed above, the City Defendants deprived Plaintiffs of this property right through the enactment of the 2019 Ordinance.

206. The PIDA Act imposes annual procedural obligations on the City. Tex. Loc. Gov't Code § 372.013.

207. Namely, the PIDA Act requires that the City Council conduct an annual review of the service and assessment plan. Tex. Loc. Gov't Code § 372.013.

208. Pursuant to the annual review, the City Council was required to compare the estimated capital improvement costs set forth in the 2003 Ordinance against the actual capital improvement costs incurred by the developer, and determine whether the costs should be incorporated into the PID property owners' capital assessments in subsequent years. Tex. Loc. Gov't Code §§ 372.013, 372.015.

209. In passing the 2019 Ordinance, the City Defendants increased the capital assessments to incorporate the developer's pre-2018 overrun capital improvement costs.

210.   Under the PIDA Act, the City Defendants could only adjust the capital assessments on an annual basis to incorporate the overrun capital improvement costs incurred by the developer in that year. TEX. LOC. GOV'T CODE §§ 372.013, 372.015–372.017.

211.   Because the City failed to conduct the annual review in the years that the developer incurred its overrun capital improvement costs, by 2019, it no longer had the authority to adjust the capital assessment to account for the developer's long-since-incurred costs.

212.   Until the 2019 Ordinance was enacted, Plaintiffs had no notice that their capital assessments would be impermissibly raised to account for the developer's overrun expenditures.

213.   Rather, PID property owners had notice that the City would *not* be adjusting their capital assessments to incorporate the developer's overrun capital improvement costs precisely because the City did not conduct the annual review or adjust their capital assessments in those years.

214.   The 2019 Ordinance increases Plaintiffs' capital assessments in direct violation of the PIDA Act's procedural requirements.

215.   In violating the PIDA Act's procedural obligations, the City afforded Plaintiffs neither notice that their capital assessment would increase to incorporate impermissible developer costs, nor an opportunity to be heard.

216.   Because the City waived its right under the PIDA Act to adjust the capital assessments on account of the developer's historical overrun costs, there is no process that the City could have provided Plaintiffs to satisfy the Constitution's due process requirement.

217.   Consequently, the Court concludes that the 2019 Ordinance violates Plaintiffs' procedural due process.

218.   Defendants argue that Plaintiffs' procedural due process claim is barred by the two-year statute of limitations.

219.   Specifically, Defendants contend that, to the extent the City failed to conduct annual reviews and/or adjust the capital assessments to incorporate overrun capital improvement expenditures, such failures occurred outside the statute of limitations.

220.   The Court concludes that the statute of limitations does not bar Plaintiffs' procedural due process claim.

221.   Plaintiffs were uninjured in the years that the City either failed to conduct the annual review, or approved the SAP without updating the assessments to incorporate already-incurred overrun capital improvement costs.

222.   Because Plaintiffs' were initially uninjured by the City's PIDA Act violations, they had no cause of action upon which to seek relief.

223.   It was only until the passage of the 2019 Ordinance that Plaintiffs suffered cognizable harm in the form of increased capital assessments on their properties.

224.   Therefore, because Plaintiffs' injuries accrued upon the passage of the 2019 Ordinance, their procedural due process claims are not barred by the statute of limitations.

## ART. I, SEC. 16 OF THE TEXAS CONSTITUTION

225.   Plaintiffs also seek a declaration that the 2019 Ordinance is an unconstitutional retroactive law that is prohibited by the Texas Constitution.

226.   The Texas Constitution provides: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art. I, § 16.

227.   The prohibition against retroactive laws has two fundamental objectives: "[I]t protects the people's reasonable, settled expectations" – *i.e.*, "the rules should not change after the game has been played" – and it "protects against abuses of legislative power." *Robinson v. Crown Cork & Seal Co., Inc.,* 335 S.W.3d 126, 139 (Tex. 2010) (citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265–66 (1994)).

228.   A retroactive law is one that extends to matters that occurred in the past. *Tenet Hosps. Ltd. v. Rivera,* 445 S.W.3d 698, 707 (Tex. 2014).

229.   "A retroactive statute is one which gives preenactment conduct a different legal effect from that which it would have had without the passage of the statute." *Union Carbide Corp. v. Synatzske,* 438 S.W.3d 39, 60 (Tex. 2014); *see also Baytown Constr. Co. v. Port Arthur*, 792 S.W.2d 554, 560 (Tex. App.—Beaumont 1990, no pet.) ("A retroactive law is an ordinance or governmental action which take away or impairs and diminishes the rights acquired under existing laws . . . or creates new obligations and imposes new duties in respect to transactions or contracts.").

230.   Here, the Court concludes that the 2019 Ordinance is a retroactive law.

231.   Specifically, the 2019 Ordinance addresses the developer's preenactment conduct of incurring overrun capital costs associated with the PID improvement projects, and the City's preenactment conduct of failing to comply with the PIDA Act.

232.   Further, the 2019 Ordinance gives this preenactment conduct "a different legal effect from that which it would have had without the passage of" the 2019 Ordinance. *Union Carbide Corp. v. Synatzske,* 438 S.W.3d 39, 60 (Tex. 2014).

233.   The 2019 Ordinance increases the capital assessments on Plaintiffs' properties, and extends the time from which Plaintiffs may obtain a release of liens on their properties.

234.   To determine whether a retroactive law violates the Texas Constitution's prohibition against retroactive laws, Texas courts consider three factors in light of the prohibition's objectives of protecting settled expectations and of preventing legislative abuses: (i) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings;" (ii) "The nature of the prior right impaired by the statute;" and (iii) "the extent of the impairment." *Robinson v. Crown Cork & Seal Co., Inc.,* 335 S.W.3d 126, 139 (Tex. 2010).

235.   Under the first *Robinson* factor, the City contends that it enacted the 2019 Ordinance in order to "reconcile the District operation." Exhibit P-009 (finding that "several provisions of the existing 2003 SAP unworkable, necessitating this amendment and restatement").

236.   Specifically, the City argues that the 2019 Ordinance was required to address (i) changes in the distribution of commercial, multifamily and single family lots, and (ii) the developer's overrun capital improvement expenditures incurred prior to 2011.

237.   Because the Court has concluded that the City forfeited its right to update the capital assessments when it failed to conduct the annual review procedures in the years such overrun costs were incurred, the Court concludes that that the purported public interest served by the 2019 Ordinance cannot be consider compelling. *See Robinson v. Crown Cork & Seal Co., Inc.,* 335 S.W.3d 126, 143–44 (Tex. 2010) (holding that retroactive legislation ostensibly enacted for sole benefit of one entity and not supported by legislative fact findings did not serve compelling government interest).

238.   Under the second *Robinson* factor, the Court considers not whether the impaired right was "vested," but the extent to which that right was "settled." *Robinson v. Crown Cork & Seal Co., Inc.,* 335 S.W.3d 126, 142–43, 147, 149 (Tex. 2010).

239.   As discussed above, Plaintiffs possess protected property rights under the PIDA Act.

240.   Specifically, under the statutory structure of the PIDA Act, Plaintiffs enjoyed settled rights to not be assessed the developer's overrun capital costs in the years that the City failed to conduct the annual review procedures.

241.   Under the third *Robinson* factor, the Court considers the extent of the 2019 Ordinance's impairment of Plaintiffs' settled rights.

242.   The effect of the 2019 Ordinance on the property rights at issue here is clear – the 2019 Ordinance increases Plaintiffs PID assessments despite the fact that the City failed to

comply with the PIDA Act's statutory scheme for adjusting assessments, and failed to accurately credit Plaintiffs for past capital assessments paid.

243.   Because the record shows that the 2019 Ordinance serves a minimal, if any, public interest while having a significant impact on Plaintiffs' interests in a constitutionally protected property right, the Court holds that the 2019 Ordinance is unconstitutionally retroactive.

## COUNT IV

**NEGLIGENT MISREPRESENTATION**

244.   Under Texas law, to succeed on a claim for negligent misrepresentation, Plaintiffs must prove: (i) TFHC made a representation to Plaintiffs in the course of TFHC's business or in a transaction in which TFHC had a pecuniary interest; (ii) TFHC supplied false information for the guidance of others; (iii) TFHC did not use reasonable care in obtaining or communicating the information; (iv) Plaintiffs justifiably relied on the representation; and (v) TFHC's negligent misrepresentation proximately caused Plaintiffs' injuries. *See, e.g., JPMorgan Chase Bank v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653–54 (Tex. 2018).

245.   A claim for negligent misrepresentation can be based on a defendant's failure to disclose information when there is a duty to do so. *See Brown & Brown v. Omni Metals, Inc.,* 317 S.W.3d 361, 384 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

246.   A duty to disclose can arise under four situations: "(1) where there is a special or fiduciary relationship; (2) where one voluntarily discloses partial information, but fails to disclose the whole truth; (3) where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue; and (4) where one makes a partial disclosure and conveys a false impression." *Buraimoh v. Bmw of N. Am.,* 2020 U.S. Dist. LEXIS 243303, at *12 (W.D. Tex. Dec. 29, 2020) (citing *Bradford v. Ventro,* 997 S.W.2d 713, 725 (Tex. App.—Corpus Christi 1999) *aff'd in part & reversed in part on other grounds by Bradford v. Vento,* 48 S.W.3d 749 (Tex. 2001)).

247.   The Court concludes that TFHC is liable for negligent misrepresentation.

248.   Under the first element of negligent misrepresentation, the Court finds that TFHC made a representation to Plaintiffs in the course of TFHC's business or in a transaction in which TFHC had a pecuniary interest.

249.   Specifically, on March 27, 2018, in response to Robert Reetz's inquiry regarding the capital assessments levied against VHC's property, Misty Ventura represented to Mr. Reetz that, under the 2003 Ordinance: (i) the capital assessments levied on VHC's property ID no. R104899 was $354,859.93; (ii) the capital assessments paid on VHC's property ID no. R104899 was $55,408.67; and (iii) the remaining capital assessments owed on VHC's property ID no. R104899 was $299,451.26.

250.   As the PID developer, this representation was made in the course of TFHC's business.

251.   In addition, this representation was made in a transaction in which TFHC had a pecuniary interest, as TFHC stood to indirectly profit from any capital assessment payments made by VHC.

252.   Under the second element of negligent misrepresentation, the Court finds that TFHC supplied false information for the guidance of VHC.

253.   Ms. Ventura's March 27, 2018 email response to Mr. Reetz contained false information.

254.   Ms. Ventura's calculations regarding the levied and outstanding capital assessments on VHC's property ID no. R104899 under the 2003 Ordinance were based on the incorrect premise that the original PID developer was lawfully exempted from paying capital assessments on property ID no. R104899.

255.   Furthermore, Ms. Ventura's calculations cannot be reconciled with TFHC's claim that VHC's capital assessments are the same under both the 2003 and 2019 Ordinances.

256.   In the March 27, 2018 email, Ms. Ventura represented that the total unpaid capital assessments on VHC's property ID no. R104899 was $299,451.26. Exhibit P-045.

257.   The 2019 Ordinance plainly states that the total unpaid capital assessments on VHC's property ID no. R104899 is $793,158.16. Exhibit P-009.

258.    Ms. Ventura's representation was made for the guidance of VHC, as Mr. Reetz had asked Ms. Ventura to obtain calculate VHC's exact assessment obligations under the 2003 Ordinance.

259.   Moreover, TFHC had a duty to disclose to VHC that the Ms. Ventura's representations in the March 27, 2018 were incorrect under the 2019 Ordinance.

260.   A duty to disclose arises "where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue." *Buraimoh v. Bmw of N. Am.,* 2020 U.S. Dist. LEXIS 243303, at *12 (W.D. Tex. Dec. 29, 2020) (citing *Bradford v. Ventro,* 997 S.W.2d 713, 725 (Tex. App.—Corpus Christi 1999) *aff'd in part & reversed in part on other grounds by Bradford v. Vento,* 48 S.W.3d 749 (Tex. 2001)).

261.   Following Ms. Ventura's March 27, 2018 communication with Mr. Reetz, TFHC negotiated with the City in an effort to maximize its PID reimbursements in excess of what was permitted under both the 2003 Ordinance and the PID Act.

262. Because TFHC's attempt to maximize its PID reimbursements through secret negotiations with the City constituted "new information" that rendered Ms. Ventura's March 27, 2018 email untrue, TFHC had a duty to disclose to VHC that its capital assessments would increase if its negotiations were successful.

263. TFHC's failure to correct its error and disclose to VHC that its capital assessments would in fact increase under the 2019 Ordinance satisfies the second element of negligent misrepresentation.

264. Under the third element of negligent misrepresentation, the Court finds that TFHC did not use reasonable care in obtaining and communicating the false information.

265. In the months following Ms. Ventura's March 2018 email to Mr. Reetz, Ms. Ventura was engaged in negotiations with George Hyde over the amount of reimbursements that TFHC could lawfully receive under the 2003 Ordinance.

266. Through these negotiations, Mr. Hyde repeatedly expressed concern over the legal accuracy of Ms. Ventura's claim regarding the amount of reimbursement to which TFHC was legally permitted under the 2003 Ordinance.

267. Moreover, the result of these negotiations – the 2019 Ordinance – increased VHC's total capital assessment on property ID no. R104899.

268. Despite Ms. Ventura's knowledge that she had supplied false information to VHC, TFHC did not correct its error and disclose this fact to VHC.

269. Taken together, the record shows that TFHC neither exercised reasonable care in obtaining and communicating the calculations supporting VHC's levied and outstanding capital assessments on property ID no. R104899, nor exercised reasonable care in disclosing to VHC that Ms. Ventura's March 27, 2018 was subsequently untrue.

270. Under the fourth element of negligent misrepresentation, the Court concludes that VHC justifiably relied on TFHC's negligent misrepresentation.

271. The PIDA Act proves PID property owners the right to "pay at any time all or any party of the assessment . . . on any lot or parcel." TEX. LOC. GOV'T CODE § 372.018(f).

272. Had VHC known in March 2018 that its capital assessments would impermissibly increase under the 2019 Ordinance, VHC could have sought and obtained a full payoff of its capital assessment lien by paying, in lump sum, its individual capital assessment obligation as set forth in the 2003 Ordinance.

273. VHC did seek to obtain a payoff and release of liens pursuant to TEX. LOC. GOV'T CODE § 372.018(f); However, the City effectively denied VHC of this right by initially refusing to provide a payoff sum, and later claiming that VHC would have to pay the total outstanding capital assessment on the entire 283 acres of the PID.

274. Notwithstanding that the City denied VHC of the right to obtain a payoff pursuant to TEX. LOC. GOV'T CODE § 372.018(f) prior to the enactment of the 2019 Ordinance, VHC reasonably relied on TFHC's misrepresentations that its capital assessments would not increase from the amount set forth in the 2003 Ordinance.

275. Under the final element of negligent misrepresentation, the Court finds that TFHC's negligent misrepresentation proximately caused Plaintiffs' injuries.

276. As discussed above, the 2019 Ordinance increased (i) Plaintiff Carolyn Smith's capital assessments by at least $1,792.00; (ii) Plaintiff LIRTEX's capital assessments by at least $716,197; and (iii) Plaintiff VHC's capital assessments by at least $661,389.

277. The Court concludes that TFHC's negligent misrepresentation has caused damage to Plaintiff Carolyn Smith in the amount of $1,792.00.

278. The Court concludes that TFHC's negligent misrepresentation has caused damage to Plaintiff LIRTEX Properties, LLC, in the amount of $716,197.

279. The Court concludes that TFHC's negligent misrepresentation has caused damage to Plaintiff The Village at Hunters Crossing, LLC, in the amount of $661,389.

**FINAL JUDGMENT**

As the Court has entered its findings of fact and conclusions of law in the above-referenced matter, the Court hereby:

DECLARES that the 2019 Ordinance enacted by Defendant City of Bastrop is INVALID;

DECLARES that the Individual Defendants have acted *ultra vires* in seeking to enforce the 2019 Ordinance;

DECLARES that the capital assessments on Plaintiff Carolyn Smith's PID property ID no. R95408 is limited to and may not be increased from $1,599.57, which represents Carolyn Smith's remaining portion of the 2003 capital assessment of $7,475,734.00, less all capital assessment payments made on property ID no. R95408, and less the proportionate amount that the original PID developer should have paid in capital assessments until it sold property ID no. R95408;

DECLARES that the capital assessments on Plaintiff LIRTEX Properties, LLC's PID property ID nos. R30102 and R114958 are limited to and may not be increased from $0.00, which represents LIRTEX Properties, LLC's remaining portion of the 2003 capital assessment of $7,475,734, less all capital assessment payments made on property ID nos. R30102 and R114958, and less the

proportionate amount that the original PID developer should have paid in capital assessments until it sold property ID nos. R30102 and R114958;

DECLARES that the capital assessments on Plaintiff The Village at Hunters Crossing, LLC's PID property ID no. R104899 is limited to and may not be increased from $54,677.14, which represents The Village at Hunters Crossing, LLC's remaining portion of the 2003 capital assessment of $7,475,734, less all capital assessment payments made on property ID no. R104899, and less the proportionate amount that the original PID developer should have paid in capital assessments until it sold property ID no. R104899;

ORDERS that the Individual Defendants are PERMANENTLY ENJOINED from implementing or enforcing the 2019 Ordinance;

ENTERS judgment in the amount of $1,379,379 against TFGC for negligent misrepresentation; and

AWARDS Plaintiffs reasonable and necessary attorneys' fees and costs of court.

2028610.v1

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **CAROLYN SMITH, THE VILLAGE AT HUNTERS CROSSING, L.L.C. and LIRTEX PROPERTIES, LLC,** | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § § | |
| **THE CITY OF BASTROP, TEXAS, CONNIE SCHROEDER, WILLIE LEWIS "BILL" PETERSON, DRUSILLA ROGERS, LYLE NELSON, BILL ENNIS, and DOCK JACKSON, each in his or her official capacity as a member of the City Council of the City of Bastrop, Texas, and LYNDA HUMBLE, DRUSILLA ROGERS, RICK WOMBLE, MICHELLE DODSON, LYLE NELSON AND TABITHA PUCEK, each in his or her official capacity as a Director of Hunters Crossing Local Government Corporation, and TF HUNTERS CROSSING, L.P. as successor-in-interest to FORESTAR (USA) REAL ESTATE GROUP, INC.,** | § § § § § § § § § § § § § § § § § | **CIVIL ACTION NO. 1:19-cv-01054** |
| **Defendants.** | § § § | |

**PLAINTIFFS' STATEMENT OF AN ESTIMATE**
**OF THE PROBABLE LENGTH OF TRIAL**

TO THE HONORABLE JUDGE ROBERT PITMAN:

Pursuant to Local Rule CV-16(e)(10), Plaintiffs Carolyn Smith, The Village at Hunters Crossing, LLC, and Lirtex Properties, LLC, estimate the probable length of trial in the above-styled and referenced cause number to be between two (2) and three (3) days.

2028615.v1